UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
————————————————————x
:
WILLIE MADDIX,                                    :
:
Plaintiff,           :
:         25 CV 1909 (HG)
-against-        :
:         (Jury Trial Demanded)
THE CITY OF NEW YORK; MARRIOTT     :
HOTEL SERVICES, INC.; MARRIOTT       :
INTERNATIONAL, INC.; and KYLE REEVES, :
:
Defendants.       :
:
————————————————————x

———————————————————————————————

**FIRST AMENDED COMPLAINT**

———————————————————————————————

Andrew M. Stengel, Esq.
The Law Firm of Andrew M. Stengel, P.C.
11 Broadway, Suite 715
New York, New York 10004
Tel: 212-634-9222
Fax: 212-634-9223
Email: andrew@stengellaw.com

*Attorneys for Plaintiff Willie Maddix*

# TABLE OF CONTENTS

NATURE OF ACTION ……………………………………………………………… 1

JURISDICTION, VENUE, & CONDITIONS PRECEDENT ……………………… 3

THE PARTIES ……………………………………………………………………. 3

ALLEGATIONS COMMON TO ALL CAUSES OF ACTION ………………………….. 4

    A.     The Crime ……………………………………………………………. 4

    B.     The KCDA's Black Sites ……………………………………………. 5

    C.     The *Brady/Giglio* Material: ADA Reeves Secretly Incarcerates Star
Prosecution Witness Robert DeJesus In A KCDA Black Site, After
DeJesus Refuses To Testify At Maddix's Trial ……………………….….. 11

    D.     Reeves Suppresses The *Brady/Giglio* Material ……………………… 13

THE KCDA'S 30-YEAR COVERUP OF THE *BRADY/GIGLIO* MATERIAL …………….. 16

    A.     The KCDA Conceals The *Brady/Giglio* Material Throughout Maddix's
19-Year Incarceration ……………………………………………………… 16

    B.     The KCDA Continues To Conceal The *Brady/Giglio* Material
For 11 Years After Maddix's Release From Prison …………………………. 18

MADDIX'S DAMAGES …………………………………………………………….. 21

FIRST CAUSE OF ACTION
Violation Of Maddix's Fifth and Fourteenth Amendment Rights To
A Fair Trial By Virtue Of Suppression Of *Brady/Giglio* Material;
All Defendants …………………………………………………………… 22

SECOND CAUSE OF ACTION
First Amendment Backwards-Looking Denial Of Access To The
Court, *Heyliger v. West*, 2022 WL 3020967, at *10 (N.D.N.Y. May 31, 2022),
*report and recommendation adopted*, 2022 WL 3017368 (N.D.N.Y.
July 29, 2022); *Jackson v. City of Cleveland*, 64 F.4th 736, 749
(6th Cir. 2023); Defendant Reves …………………………………………….. 23

THIRD CAUSE OF ACTION

    Fifth And Fourteenth Amendment Substantive Due Process Claim For
    Defendants' Coverup; All Defendants …………………………………………….  25

FOURTH CAUSE OF ACTION
    (*Monell* Claim based on the KCDA's unconstitutional training, policies, customs,
    and practices, and failure to supervise, discipline, and rectify amounting
    to deliberate indifference); Defendant City ……………..……………..………….. 27

FIFTH CAUSE OF ACTION
    (*Monell* Claim Based on the KCDA's Cover-Up Policy And Custom);
    Defendant City …..………………………………………………………………  55

SIXTH CAUSE OF ACTION
    (*Monell* Claim Based On Marriott's policy, custom, and practice of
    facilitating *Brady/Giglio* violations, policymakers 'actions, and
    deliberate indifference; Defendant Marriott …………………………..……………..  63

SEVENTH CAUSE OF ACTION
    (42 U.S.C. §1983 Civil Conspiracy, Concerted Action, And
    Aiding and Abetting The Violation Of Maddix's Fifth And Fourteenth
    Amendment Rights To A Fair Trial & Post-Conviction Disclosure Of
    *Brady/Giglio* Material); All Defendants …..…………………………………….. 66

EIGHTH CAUSE OF ACTION
    (New York State Constitutional Due Process Claim Pursuant To *Respondeat*
    *Superior*; *Buari v. City of New York*, 530 F.Supp.3d 356 (S.D.N.Y.  2021);
    *Bolt v. City of New York*, 21 CV 2218 (Report & Recommendation,
    Sept 15, 2023) (Kuo, M.J.); *Johnson v. City of New York*, 21 CV 2220
    (Sept. 15, 2023) (Kuo, M.J.) (Report & Recommendation, Sept. 15, 2023);
    Defendant Marriott ………..……………………………………………………… 68

DAMAGES DEMAND ……………………………………………………………………68

## TABLE OF EXHIBITS

Exhibit A       KCDA DI Directive On Custodies

Exhibit B       KCDA Prisoner Form

Exhibit C       KCDA Hotel Reservation Letter

Exhibit D       Excerpt of DA Hynes Deposition

Exhibit E       *People v. Collins* MWO Materials

Exhibit F       *People v. Ellis* MWO Materials

Exhibit G       *People v. Spruill* MWO Materials

Exhibit H       Appearance Transcript in *People v. Wagstaffe*

Exhibit I       FBI Report Regarding Hynes' Probable Criminal Activity, June 23, 2014

Exhibit J       KCDA Custody Reservation Request For DeJesus

Exhibit K       KCDA Custody Schedule For DeJesus

Exhibit L       KCDA Hotel Reservation Letter For DeJesus

Exhibit M       KCDA Riding Policy Memorandum

Exhibit N       KCDA CLE Tips for New  Prosecutors, Kings County DA

Exhibit O       List of 78 Court Decisions

Exhibit P       Letter of Kellner's Attorney to Kings County DA's Office Requesting *Brady* Material, July 13, 2013

Exhibit Q       Kings County DA's Office July 5, 2013, Letter, Personally Edited By Hynes

Exhibit R       Email of Chief of Trials Joseph Alexis to Rackets Division Chief Michael F. Vecchione, July 2, 2013

Exhibit S       ADA Rebecca Gingold's June 7, 2012, Memo to Michael Vecchione in People v. Crooks, Kings County Ind. No. 5226-11

Exhibit T       Hynes' Email to Michael Vecchione, June 24, 2012

Exhibit U     KCDA FOIL Memo

Exhibit V     Affidavit of Material Witness Richard Rivera

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————————x
                                            :

WILLIE MADDIX,                         :              **FIRST AMENDED**
                                              :              **COMPLAINT**
                      Plaintiff,        :
                                              :              25 CV 1909 (HG)

          -against-                :
                                              :              (Jury Trial Demanded)

THE CITY OF NEW YORK, MARRIOTT   :
HOTEL SERVICES, INC., MARRIOTT    :
INTERNATIONAL, INC., and KYLE REEVES, :
                                              :

                    Defendants.     :

                                              :
———————————————————————x

        Plaintiff WILLIE MADDIX, by his attorneys THE LAW FIRM OF ANDREW M. STENGEL, P.C., respectfully alleges, upon information and belief:

**NATURE OF ACTION**

        1.     This civil rights action under 42 U.S.C. §§ 1983 and 1988, and New York law, arises from the violation of the constitutional rights of Willie Maddix, a man who spent 19 years in prison due to egregious prosecutorial misconduct by the Kings County District Attorney's Office ("KCDA") under the long-term administration of disgraced former District Attorney Charles J. Hynes.

        2.     DA Hynes's Office violated Maddix's Fifth and Fourteenth Amendment right to a fair trial by suppressing *Brady/Giglio* material during his 1994 murder trial by covering up that suppression for nearly three decades.

        3.     Unbeknownst to Maddix, the prosecutor's star witness refused to testify during his trial.  In response, the prosecutor secretly imprisoned the witness against his will in a Brooklyn hotel room, and held him *incommunicado*, under armed guard, to coerce his trial testimony.  The

1

prosecutor then went to the hotel and informed the witness he would be released if he testified. Only then, after being held as prisoner in a hotel room by armed guards, did the witness abandon his recalcitrance and testify against Maddix.

4.     Under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972), the prosecutor was constitutionally required to disclose these facts to the defense as it was crucial impeachment material and they went to the heart of the witness's motive for testifying against Maddix.

5.     Yet rather than disclose these inconvenient facts, the prosecutor suppressed them and falsely portrayed the recalcitrant witness as a Good Samaritan with "no motivation to lie" with "nothing at stake," even though the witness's release from being held in custody against his will was contingent on his testimony against Maddix.

6.     Maddix was convicted of weapon possession and ultimately spent nearly two decades in prison, where he was the victim of repeated acts of violence and attempted rape which caused severe trauma and emotional distress.

7.     This lawsuit seeks to hold the City of New York liable for this conduct, under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), as the violation of Maddix's constitutional rights resulted from the KCDA's training, policies, customs and practices evincing deliberate indifference to the constitutional rights of criminal defendants prosecuted by that office.

8.     This lawsuit also seeks to hold Marriott Hotel Services, Inc. and its parent company, Marriott International, Inc.—which owned and operated the hotel where the KCDA illegally imprisoned the witness—liable under *Monell* and theories for civil conspiracy and civil aiding and abetting.

9.      Both Marriott Hotel Services, Inc. and Marriott International, Inc. knowingly facilitated the KCDA's *Brady/Giglio* violations, benefiting handsomely from allowing their hotel to serve as a *de facto* CIA-like "black site" where KCDA prosecutors secretly imprisoned witnesses who refused to cooperate in criminal cases to coerce them to testify,

## **JURISDICTION, VENUE & CONDITIONS PRECEDENT**

10.      This action arises under 42 U.S.C. §§ 1983 and 1988, and the common law of the State of New York.

11.      Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343, and by principles of pendent jurisdiction.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## **THE PARTIES**

12.      Plaintiff Willie Maddix ("Maddix") is a resident of the State of New York.

13.      Defendant, the City of New York ("City"), of which the County of Kings is a political subdivision, is a municipal corporation of the State of New York.

14.      The Kings County District Attorney's Office ("KCDA") is a municipal agency of the City.

15.      Defendant Marriott Hotel Services, Inc. is a Delaware corporation duly authorized to transact business within the State of New York.

16.      At all relevant times, Marriott Hotel Services, Inc. owned and operated the Marriott LaGuardia Hotel located at 120-05 Ditmars Boulevard, East Elmhurst, New York.

17.      Defendant Marriott International, Inc. is a Delaware corporation, and at all relevant times was the corporate parent of Marriott Hotel Services, Inc.

18.      Unless otherwise indicated, Marriott Hotel Services, Inc. and Marriott International, Inc. are collectively referred to as "Marriott."

19.     Defendant Kyle Reeves is a former Assistant Kings County District Attorney ("Reeves").  He is sued solely for declaratory and retrospective relief.[1]

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A.     The Crime

20.     On July 20, 1993, Jose Felix was killed and Larry Blutcher was shot during a shootout by at least two groups of men in front of 657 Vermont Avenue in Brooklyn.

21.     Maddix was arrested on August 30, 1993, over one month after the shooting.

22.     Following Maddix's arrest, the KCDA assigned the case to Assistant District Attorney ("ADA") Kyle Reeves, a prosecutor with a horrendous history of prosecutorial misconduct.[2]

---

[1] *Schloss v. Bouse*, 876 F.2d 287, 292 (2d Cir.1989) (prosecutor's entitlement to "absolute immunity from a claim for damages does *not* bar the granting of injunctive relief … or other equitable relief.") (emphasis added) (citations and quotes omitted); *Levy v. Lerner*, 853 F.Supp. 636, 641 (E.D.N.Y. 1994) (Glasser, J.) ("[T]he absolute immunity that may shield prosecutors from a damages claim does *not* bar the granting of declaratory or injunctive relief") (emphasis in original), *aff'd*, 52 F.3d 312 (2d Cir. 1995).

[2] In September 2020, the Appellate Division affirmed the vacatur of one of Reeves's 1999 murder convictions because he failed to disclose *Brady* material concerning benefits received by his witness, and falsely argued in summation that the witness "never took a deal" and "never asked for anything in return" for cooperating. *People v. Rodriguez*, 186 A.D.3d 1724, 1725 (2d Dep't 2020).  In July 2017, the KCDA moved to vacate the wrongful 1997 murder conviction of Jabbar Washington, admitting that Reeves knowingly used false testimony, suppressed *Brady* material, and caused Washington to spend 20 years in prison.  *See* Alan Feuer, *Brooklyn District Attorney Hopes to Void 1997 Murder Conviction*, New York Times, July 11, 2017 (https://www.nytimes.com/2017/07/11/nyregion/brooklyn-district-attorney-hopes-to-void-1997-murder-conviction.html).  (In 2015, the Appellate Division reversed another one of Reeves's 2013 murder convictions because of his misconduct during "*voir dire* questioning of the defendant's expert, on cross-examination of that expert, on cross-examination of another of the defendant's witnesses, and on summation." *People v. Martinez*, 127 A.D.3d 1236, 1236 (2d Dep't 2015).  In 2014, during the trial in that same case, Reeves failed to disclose *Brady* material resulting in a mistrial. *See* Ann Givens and Chris Glorioso, I-Team: *Despite Misconduct Finding, Prosecutor Back on Murder Case*, October 27, 2015 (https://www.nbcnewyork.com/news/local/prosecutor-complaintsasim-martinez-staten-island-kyle-reeves-new-york-investigation/2023919).  In *People v. Samuel*, 88 A.D.3d 1020, 1021 (2d Dep't 2011), the Appellate Division held "some of [Reeves'] questions and comments on cross-examination were improper" but the error during the 2006 trial was harmless.  In *People v. Benloss*, 117 A.D.3d 1071, 1072 (2d Dep't 2014), Reeves failed to disclose one of his witnesses at the 2003 trial had a criminal charge pending against him, but the Court held the defendant was not prejudiced.  In an earlier decision in that same case, *People v. Benloss*, 60 A.D.3d 686, 686-87 (2d Dep't 2009), the Appellate Division held Reeves "acted improperly in asking a witness if anyone else had been injured in the incident, resulting in testimony that a young girl

23.     On September 7, 1993, the KCDA represented to Maddix and his attorney, in a Voluntary Disclosure Form, that the KCDA was aware of its *Brady* obligations, but no such evidence was known to it at that time.

**B.     The KCDA's Black Sites**

24.     Unbeknownst to Maddix, during the entirety of former KCDA Charles J. Hynes's administration—from 1990 to 2013— Hynes used a network of New York hotels as personal, CIA-like "black sites" to illegally incarcerate and coerce witnesses who refused to cooperate in criminal cases.

25.     Under New York City Administrative Code § 9-125, only the New York City Commissioner of Correction is authorized to maintain custody of civil prisoners.

26.     Yet deposition testimony from KCDA executives and detective-investigators ("DIs") in several federal civil lawsuits revealed the KCDA under Hynes would illegally ignore the statutorily mandated material witness court process, and incarcerate witnesses who were targets of material witness warrants *incommunicado*, in hotel rooms, under armed guard, in the sole custody of the KCDA.

27.     According to deposition testimony from several DIs, the DIs would approach the target witness, tell the witness they had a warrant for the witness' arrest and inform the witness he or she had to come with the DIs to the DA's Office, or he or she would be arrested.

28.     In truth, the material witness statute and warrant, codified in Article 620 of the New York State Criminal Procedure Law, required the witness to be produced *to court*, not to the DA's

---

also was shot. Such testimony was immaterial to the charges against the defendant, was elicited in violation of the prosecutor's obligations under [New York law]."  In *People v. Samuel*, 226 A.D.2d 562 (2d Dep't 1996), the Appellate Division held Reeves "made several improper remarks in his summation" during the 1994 trial but due to the court's curative instructions, declined to vacate the conviction.

Office, "forthwith" for assignment of counsel and an evidentiary hearing to determine whether the witness was a material one, and whether he or she should be held in custody or released on his or her own recognizance.

29.    If the witness refused to accompany the DIs to the DA's office, the DIs would arrest the witness, handcuff him or her and bring the witness to the DA's Office by force.[3]

30.    At the DA's Office, the prosecutor who obtained the material witness warrant would inform the witness he or she had two choices: (1) the witness could stay in the DA's custody until they testified and be held in a hotel, or (2) the witness would go to jail.

31.    The prosecutors' representations were false. Witnesses were actually entitled to assignment of counsel and an evidentiary hearing, after which they had the opportunity to be released on their own recognizance. Even if the court decided a witness should be declared a material one, New York law required the court to set a reasonable bail, potentially avoiding any incarceration at all. CPL § 620.50 (2).

32.    Witnesses deceived in this manner were taken against their will to various New York hotels, *i.e.*, kidnapped, where they were confined as "prisoners," under the sole control of the KCDA, without any judicial or public oversight.

33.    The location of the hotels where the witnesses were held was kept "confidential," and known only to the prosecutors and DIs.

_____

[3] *See* Deposition of DI Christopher Salsarulo in *Quezada v. Brown*, 08 CV 5088 (KAM) (VVP) (E.D.N.Y.), January 19, 2012 (DI testifying they would tell the witness they had a material witness warrant and that the witness needed to come with them to the DA's Office to meet with the prosecutor, and that should the witness decline the DIs' "request," they would immediately handcuff the witness, even if the only thing the witness had on was underwear, and bring the witness to the DA's Office by force). Whether by virtue of the DIs' deception or use of force to compel the witnesses to accompany the DIs to the DA's Office, the DIs violation of the terms of the material witness warrants rendered the seizures illegal *and* unconstitutional. *See e.g. Simon v. City of New York*, 893 F.3d 83, 95 (2d Cir. 2018) ("A seizure that flouts the plain terms of its authorizing instrument is … unreasonable.")

34.     The DIs forced the witnesses into hotel rooms adjoining a second hotel room where two armed DIs were on watch.

35.     A KCDA directive instructed DIs to prevent the witnesses from escaping. **Exhibit A** (KCDA Investigator's Directive 14B (Custody Procedures), May 12, 1993, at ¶ 1) ("All custodies will be maintained utilizing at least two Detectives … In the case of a hostile witness or potential arrestee, Detectives will exercise sufficient control to guard against escape").

36.     The witnesses' hotel room doors would be shackled with handcuffs, *id.* at ¶ 10 ("Hallway doors will be secured at all times with a security lock in the custodies room.  This lock will be checked by the Detectives at the start of each tour and a log entry of the inspection will be placed in the custody log book.  The door between the room will have the lock removed and will be kept open at all times.")[4]

37.     In violation of the Fourth Amendment to the U.S. Constitution and New York law establishing minimum standards under which civil prisoners may be detained, the witnesses were held in the hotels *incommunicado*, unable to make telephone calls, have visitors, or seek the legal counsel they were entitled to.  *Id.* at ¶¶ 2, 5.[5]

38.     A KCDA form used to record the rotation of DIs maintaining custody of the witnesses brazenly featured a section with a check off for witnesses who were being held as a "prisoner," as opposed to being in legal protective or voluntary custody, for example:

---

[4] *Accord* Deposition of Former DI Christopher Salsarulo in *Quezada v. Brown*, 08 CV 5088 (E.D.N.Y.) (KAM) (VVP), Jan. 19, 2012, pp. 70-73 (describing detention procedures, including shackling of the witness 'room door with handcuffs); Deposition of Former DI Renee Krelik in *Quezada v. Brown*, 08 CV 5088 (E.D.N.Y.) (KAM) (VVP), Jan. 23, 2012, pp. 68-70 (same).
[5] *Simon v. City of New York,* 893 F.3d 83, 93 (2d Cir. 2018) ("[A] person detained as a material witness enjoys any Fourth Amendment protection that is extended to criminal suspects."); 9 NYCRR §§ 7510.1 (a) and 7502.1 (e) (providing all inmates shall have the right to call their attorneys, make telephone calls, and receive visitors).



**Exhibit B**.

39.     A KCDA form letter used to reserve the rooms at the hotels instructed the hotels that "[t]here will be no food, telephone, or movie privileges for the single room.  Telephone privileges only will be provided for the adjoining double":

DISTRICT ATTORNEY OF KINGS COUNTY
MUNICIPAL BUILDING
BROOKLYN, N.Y. 11201
(718) 802-2000

CHARLES J. HYNES
DISTRICT ATTORNEY

date _IX/ov 30, 1994_

_Holiday Inn Crowne Plaza_
_104-04 D. Thomas Blvd_
_E.M.T. Elmhurst N.Y._
_Fax (718) 899-9768_     Tel.# (718) 457-6300

Re:  Custody # _1467_

Dear Sir or Madam:
        This letter is to confirm reservations made on _Nov. 30, 1994_
                                                    (date)
with ___LINDA___ for two rooms (single and
        (contact)
adjoining double).  This custody was reserved under the name of
_Michael Wishner_ and will begin on _Nov. 30, 1994_
                                    (date)
and on _Dec. 1, 1994_
        (date)
        There will be no food, telephone or movie privileges for the
single room.  Telephone privileges **only** will be provided for the
adjoining double.
        All billing is to be directed to the Kings County District
Attorney's Office, Attention:  Mr. Richard Safianow.
        Should you have any questions, please contact me at
718-802-2994.
                        Very truly yours,

                        Richard I. Safianow
                        Deputy Director of Operations

Confirmation # _62288013_               OPER 26 - Rev. 6/94

**Exhibit C**.

40.     The witnesses' detention was designed to be coercive, to wear down their resistance to cooperating, and to have them provide trial testimony the prosecutor sought. With no television privileges in their rooms, the witnesses could do nothing but sit for hours or days in boredom, increasing the pressure on them to cooperate to be released and returned to their jobs, families and lives.

41.     The witnesses were totally dependent on the DIs for food and had no method of challenging their imprisonment.

42.     Witnesses could not even use the bathroom in private; they had to keep the bathroom door open to be observed by DIs at all times.  **Exhibit V**.

43.     The entire practice was designed to circumvent the mandates of Article 620 of the Criminal Procedure Law, court process, deprive vulnerable witnesses of their right to counsel and a court hearing and to avoid any oversight of, or challenge to, the KCDA's illegal conduct.

44.     The KCDA's practice was, as a matter of law, unconstitutional.

45.     Remarkably, DA Hynes, during a videotaped deposition in the Jabbar Collins civil rights lawsuit, *admitted* (a) to the existence of the illegal practice—which he euphemistically referred to as his "Hotel Custody Program," (b) witnesses at the hotels were not free to leave and were held as "prisoners," and (c) he could *not* provide any statutory or legal basis authorizing him to do so.  Transcript of Deposition of Charles J. Hynes in *Collins v. City of New York,* 11 CV 766 (FB)(RML), Dec. 19, 2013.  **Exhibit D**.

46.     Exacerbating this already unconscionable behavior, KCDA prosecutors would routinely conceal their coercion of such witnesses to defense attorneys and during trial, and falsely represent to the defense, court and jury that the witnesses was placed in "protective custody."[6]

47.     The KCDA's illegal practice was in effect for at least 14 years before Maddix's 1994 trial.

48.     Moreover, a year prior to Maddix's 1994 trial, a Kings County Supreme Court Judge, Gloria Goldstein, in the course of excoriating a prosecutor in open court in connection with this practice, ruled the KCDA could not avoid bringing a material witness to court by claiming the witness "voluntarily" agreed to being taken into KCDA custody:

> Once you give me the [material witness] order to sign, once I sign it, you must have it executed. You have no alternative. You cannot say it does not have to be executed. It's a direction to an officer to bring that person straight before this Court, not in your office, not anywhere else, but straight to the Court …[T]here's no such thing as voluntarily anymore, because this is an order of this Court to bring her in. There's no voluntarily anymore. So, you cannot say now if she comes in voluntarily. You must execute that order. If I'm not sitting and it's in the middle of the night, you have to bring her to [Criminal Court] where they'll determine what bail, if any, should be put on her …. I've had this out with your office now for fourteen

---

[6]**Exhibit E** (June 1995 trial transcript in *People v. Jabbar Collins*, Ind. No. 2884/94, reflecting KCDA Homicide Bureau Chief Michael Vecchione representing to judge in open court that prosecution witness Angel Santos was placed in "protective custody" due to threats from Collins's family; secret material witness warrant and hotel custody documents showing Santos was actually incarcerated in a hotel as a prisoner; Santos's federal habeas hearing testimony before Judge Irizarry, *Collins v. Ercole*, 08 CV 07636 (DLI), swearing Collins's family never threatened him, and the only one who did was Vecchione); **Exhibit F** (November 1994 trial transcript in *People v. Gregory Ellis*, Ind. No. 6587/94 reflecting Reeves representing to judge in open court that prosecution witness Richard Rivera was placed in "protective custody" because Ellis's codefendant's family threatened Rivera; secret material witness warrant and hotel custody documents showing the prosecutor actually incarcerated Rivera in a hotel as a prisoner when he refused to testify; Rivera's sworn affidavit swearing he was never threatened, Reeves convinced him to go to a hotel because Reeves feared Rivera's out of control drug addiction would make him unavailable for trial, and once Rivera refused to testify, Reeves incarcerated him in the hotel); **Exhibit G** (July 1998 trial transcript in *People v. Tasker Spruill*, Ind. No. 13008/95 reflecting Senior KCDA homicide prosecutor Stan Irvin representing to judge in open court that he needed to call prosecution witness Marilyn Connor because she might disappear if her testimony was adjourned but incredibly concealing from the Court that Connor was already in KCDA's custody on an undisclosed material witness warrant).

years. There is absolutely no voluntary after that …. It will be for
the Court to determine if it's vacated or not, not you.

**Exhibit H** (January 19, 1993, Appearance in *People v. Wagstaff*, Kings Co. Ind. No. 1545/92)

(emphasis added).[7]

49. It was not until 2013, when Kenneth P. Thompson defeated DA Hynes and became

the new KCDA, that the KCDA's practice of kidnapping and illegally incarcerating witnesses

without seeing a judge or allowing them access to counsel finally ended. [8]

**C.** **The *Brady/Giglio* Material: ADA Reeves Secretly Incarcerates Star Prosecution
Witness Robert DeJesus In A KCDA Black Site, After DeJesus Refuses To Testify
At Maddix's Trial**

50. Maddix's trial began in August 1994. Robert DeJesus was ADA Reeves's star

witness against Maddix. However, unbeknownst to Maddix, DeJesus was recalcitrant and refused

to testify at trial.

---

[7]Witnesses deceived by DIs and prosecutors could not, as a matter of law, "consent" to going into KCDA
custody. *See e.g. Bumper v. North Carolina,* 391 U.S. 543, 549-50 (1968) (consent obtained through
government misrepresentation is inherently coercive); *People v. Cruz*, 44 Misc.3d 640, 644 (Crim. Ct.
Queens Co. 2014) (confinement obtained through deception is "inherently non-consensual") citing Penal
Law § 135.00(1) (a person is confined "without consent" when that confinement is accomplished by
deception).

[8]With Hynes's loss, he achieved the dubious distinction of being the first incumbent DA to lose a reelection
in Brooklyn in over 100 years. Reid Pillifant, *Ken Thompson makes history against Joe Hyne*s, Politico,
September 11, 2013. Kenneth P. Thompson defeated Hynes in 2013, and after reviewing the state of the
office, publicly declared he had "inherited a legacy of disgrace [from former DA Charles J. Hynes] with
respect to wrongful convictions[.]" Colin Moynihan, *2 Brooklyn Murder Convictions From 86 'Are
Vacated*, New York Times, Oct. 16, 2014. Under Hynes's administration, at least 25 mostly poor and
minority men were falsely convicted and collectively lost over 426 years of their lives in prisons for crimes
they did not commit. *See e.g.* Kings County District Attorney's Office, 426 Years: An Examination of 25
Wrongful Convictions in Brooklyn, New York, July 9, 2020. The "scandal" prompted a rare editorial from
a federal judge calling for an end to prosecutorial immunity. *See* Honorable Frederic Block, Senior District
Judge, Let's Put An End To Prosecutorial Immunity, The Marshall Project, March 13, 2018. To date, the
KCDA's Conviction Review Unit has exonerated 40 defendants Hynes wrongfully convicted. *See* chrome-
extension://efaidnbmnnnibpcajpcglclefindmkaj/http://www.brooklynda.org/wp-
content/uploads/2024/10/TIMELINE-Blue-10-3-24.pdf. Incredibly, while Hynes falsely convicted others
of crimes they did *not* commit, in June 2014 the FBI concluded "there is an articulable and factual basis
HYNES engaged in criminal activity[,]" in the use of nearly $1,000,000 in civil forfeiture funds to pay a
political consultant to work on his 2013 election campaign, **Exhibit I** at p. 5. The FBI then approved a
"full field investigation" culminating in the US Attorney's Office convening a federal grand jury. (Hynes
was not indicted and passed away shortly thereafter.)

51.     In response, on July 30, 1994, Reeves obtained an *ex parte* material witness warrant for DeJesus's arrest.

52.     DIs located DeJesus, and rather than bring him to court as required by the Criminal Procedure Law, they illegally imprisoned him at the Marriott LaGuardia Hotel, at 120-05 Ditmars Boulevard, East Elmhurst, New York.

53.     The KCDA assigned DeJesus Custody Number 1407. *See* KCDA Custody Reservation Request for DeJesus. **Exhibit J**.

54.     The DA Custody Form listing the rotation of DIs imprisoning DeJesus confirms DeJesus was held as a "Prisoner[.]" *See* KCDA Custody Schedule. **Exhibit K**.

55.     DeJesus was held in a hotel room adjoined by two DIs who controlled all entry and exits from their room. Both of the DIs were armed and DeJesus was not free to leave.

56.     The door to DeJesus's room was shackled with leg irons so that he could not leave.

57.     The hotel room DeJesus was incarcerated in did not have a telephone. DeJesus was not allowed to have visitors and had no access to anyone other than the two DIs imprisoning him. *See* KCDA Letter reserving hotel room. **Exhibit L** (indicating no food/room service, no television and "only telephone service in double room. None in single room"). Moreover, DeJesus was unable to challenge his custody as, in violation of New York and federal law, he had no access to a telephone, lawyer or a court.

58.     The same day DeJesus was incarcerated, Reeves visited the hotel room where DeJesus was being held.

59.     Reeves conveyed to DeJesus, in sum and substance, that if DeJesus testified in accordance with Reeves's case narrative, DeJesus would be released from custody.

60.     DeJesus's release from custody was thus dependent on his cooperation against Maddix.

61.     After spending nearly three days imprisoned, DeJesus's will deteriorated and he finally abandoned his recalcitrance and agreed to testify against Maddix.

62.     Reeves's coercion of DeJesus's trial testimony was *Brady/Giglio* material Reeves was obligated to disclose to Maddix and his attorney, as it provided Maddix with the basis to preclude DeJesus's trial testimony on legal coercion and abuse of process grounds,[9] demonstrated DeJesus's secret motive for testifying[10] and enabled Maddix to attack the integrity of the prosecution's case.[11]

## D.     Reeves Suppresses The *Brady/Giglio* Material

63.     Reeves was required, under the U.S. Constitution and laws of the State of New York, to disclose to the defense all evidence and information known to the KCDA that was favorable to the defense and, considered cumulatively, was reasonably likely to affect the outcome of the trial ("*Brady/Giglio*" material).

---

[9]*People v. Russ,* 79 N.Y.2d 173, 177-78 (1992) (excluding legally coerced testimony); *People v. Steven Ruiz, et a*l., Kings Co. Ind. No. 12848/94 (April 20, 1995, order) (Kreindler, J.) (precluding DA from using statement obtained by an illegal office subpoena); *People v. Arocho,* 85 Misc.2d 116, 118 (Sup. Ct. New York Co. 1976) (suppressing statements taken during illegal office subpoena interview); *People v. Williams,* 7 N.Y.3d 15, 19 (2006) ("[D]efendant was entitled to disclosure of any evidence of a material nature [favorable to the defense] which if disclosed could affect the ultimate decision on a suppression motion").

[10]"The thrust of *Giglio* and its progeny has been to ensure that the jury know the facts that might motivate a witness in giving testimony, and that the prosecutor not fraudulently conceal such facts from the jury." *Smith v. Kemp,* 715 F.2d 1459, 1467 (11th Cir. 1983); *Brown v. Wainwright,* 785 F.2d 1457, 1465 (11th Cir. 1986) ("The constitutional concerns address the realities of what might induce a witness to testify falsely, and the jury is entitled to consider those realities in assessing credibility.")

[11]*Quezada v. Smith,* 624 F.3d 514, 522 (2d Cir. 2010) (KCDA's alleged non-disclosure that police illegally confined witness in a hotel room and threatened him with 10 years imprisonment was *prima facie* constitutional error.)

64. This included information tending to impeach the credibility of significant witnesses called by the prosecution to meet its burden of convincing every member of the jury, beyond a reasonable doubt, that Maddix was guilty.

65. Such information was required to be disclosed in a timely manner, meaning sufficiently in advance of trial to permit the defense to adequately investigate and make use of it.

66. Such information had to be disclosed whether or not it was recorded or memorialized in writing.

67. The defense was legally entitled to rely on the completeness of Reeves's *Brady/Giglio* disclosures.

68. By law, the defense was not required to assume Reeves, as an officer of the court, made incomplete, false and/or misleading disclosures.

69. Moreover, Maddix's reliance on the truth of Reeves's factual representations was particularly important as Maddix and his defense attorney were completely reliant on the information Reeves provided to them.

70. At Maddix's trial, Reeves presented two witnesses, Blutcher and Robert DeJesus. Blutcher, however, had a horrendous criminal history and outstanding warrants for narcotics possession that called his credibility into question.

71. Thus, DeJesus was Reeves's star witness.

72. Yet Reeves, rather than comply with his constitutional, statutory and ethical obligations, at trial suppressed the *Brady/Giglio* material and falsely portrayed DeJesus as a Good Samaritan with no undisclosed motive for testifying.

73.     Reeves led DeJesus to testify they had spoken twice before trial, creating the impression that DeJesus and the prosecutor were being open and forthright about their pretrial interactions.

74.     In summation, Reeves argued DeJesus was credible and that he had no motive for testifying: "[He] came in here and told you what he saw. He's got no motivation to lie. He's got nothing at stake."

75.     Neither Reeves nor anyone else from the KCDA disclosed to the defense the coercion of DeJesus, or the fact that Reeves obtained a material witness order and warrant targeting DeJesus.

76.     The jury never had a chance to consider the *Brady/Giglio* material when assessing DeJesus's credibility and deciding whether to credit his testimony.

77.     The *Brady/Giglio* material impeaching DeJesus, the prosecution's case, and providing the basis for suppression of DeJesus's testimony, was favorable to Maddix, and there is a reasonable probability that if Reeves disclosed the material prior to trial, Maddix would have been acquitted of the weapons charge.

78.     The jury, unaware of the *Brady/Giglio* material, however, convicted Maddix of criminal possession of a weapon in the second degree based in part on DeJesus's testimony.[12]

79.     On August 22, 1994, Maddix was sentenced to 5 to 15 years in prison.

80.     All of Reeves's misconduct and the *Brady/Giglio* violations detailed above preceded the judgment of conviction. The judgment of conviction merely ratified, acquiesced in or left Reeves's pre-judgment conduct unpunished.

---

[12]Maddix was acquitted of the murder charges.

## THE KCDA'S 30-YEAR COVERUP OF THE *BRADY/GIGLIO* MATERIAL

**A.      The KCDA Conceals The *Brady/Giglio* Material**
**Throughout Maddix's 19-Year Incarceration**

81.      The KCDA had a continuing obligation to disclose the *Brady/Giglio* material suppressed during Maddix's trial.

82.      Yet rather than disclose the *Brady/Giglio* material Reeves suppressed during Maddix's trial, the KCDA suppressed it throughout Maddix's 19-year incarceration.

83.      On August 22, 1994, Maddix, right before being sentenced, made a CPL § 330.30 motion to overturn his conviction, arguing the court erred by failing to preclude DeJesus's testimony due to the loss of a pretrial statement he made to the KCDA.

84.      Reeves opposed the motion while continuing to conceal his confinement of DeJesus, which ironically, provided an independent basis to preclude DeJesus's trial testimony.

85.      The court denied Maddix's CPL § 330.10 motion.

86.      On May 15, 1997, the KCDA filed its respondent's brief opposing Maddix's direct appeal.

87.      The KCDA's brief recounted DeJesus's coerced trial testimony implicating Maddix and omitted any reference to how DeJesus's testimony was obtained.

88.      On November 10, 1997, the Appellate Division denied Maddix's appeal. *People v. Maddix*, 244 A.D.2d 432 (2d Dep't 1997).

89.      On March 24, 1998, Maddix filed a CPL § 440.10 motion, arguing his trial attorney was ineffective and the verdict was repugnant.

90.      The KCDA responded by contending DeJesus's trial testimony was credible, arguing Maddix's acquittal on the murder charges did not mean the jury discredited the prosecution's entire case.

91.     On April 20, 1998, the court denied Maddix's CPL § 440.10 motion.

92.     On January 19, 1999, Maddix filed a timely federal *habeas corpus* proceeding in the U.S. District Court for the Eastern District of New York.  There, Maddix raised an ineffective assistance of the trial counsel claim.  *Maddix v. Moscicki*, 99 CV 347 (ARR).

93.     On May 21, 1999, the KCDA submitted the state court record to the EDNY.

94.     Under Fed.R.Civ.P. 11, the KCDA, by making those submissions, represented to the district court that "the factual contentions have evidentiary support[.]" *Id.*

95.     Once again, however, the KCDA failed to disclose the coercion leading to DeJesus's trial testimony.  The KCDA's concealment of the *Brady/Giglio* material during Maddix's *habeas* proceeding precluded him from raising those issues in his *habeas* petition, moving to stay the petition, or moving to amend it.  If Maddix were aware of the *Brady/Giglio* material, then he would have moved to stay and amend his habeas petition.  If he discovered the material while he was still in custody but after his habeas proceeding, then he would have filed a motion for leave to file a second or successive *habeas* petition.

96.     The KCDA's suppression during Maddix's habeas proceeding was "akin to a fraud on the federal habeas courts; that is, the [KCDA] took affirmative actions to conceal [its] tacit agreement with the state's key witness until it was too late, procedurally, for [the petitioner] to use that undisclosed agreement successfully to challenge his … conviction." *Douglas v. Workman*, 560 F.3d 1156, 1193 (10th Cir. 2009).

97.     On March 23, 2000, the district court denied Maddix's *habeas* petition.

98.     On September 26, 2000, the U.S. Court of Appeals for the Second Circuit denied Maddix's timely application for a certificate of appealability.

99.     Following that denial, Maddix served an additional 12 years in prison.

100.    On August 29, 2012, Maddix was finally released from prison.  He was later discharged from parole supervision.  Maddix's release from custody bars him as a matter of law from obtaining federal *habeas corpus* review of Reeves's suppression of the *Brady/Giglio* material

**B.     The KCDA Continues To Conceal The *Brady/Giglio* Material**
**For 11 Years After Maddix's Release From Prison**

101.    Following Maddix's 2012 release from prison, the KCDA continued to conceal the *Brady/Giglio* material suppressed during his trial and post-conviction challenges.

102.    Specifically, from August 2012 until December 2024, the KCDA continued to suppress the *Brady/Giglio* material from Maddix, and to this day has never made a full disclosure of the *Brady/Giglio* material in his case.

103.    The first time Maddix learned of the *Brady/Giglio* material was on December 18, 2024, when a researcher working on an unrelated wrongful conviction case alerted Maddix to the *Brady/Giglio* material in his case, which was obtained through a public records request.

104.    Prior to December 18, 2024, Maddix did not know or have any reason to know of the *Brady/Giglio* violations in his case.  To the contrary, Reeves's representations throughout Maddix's trial and the KCDA's representations afterward misled Maddix to believe no such impeachment materials existed, and DeJesus had no undisclosed motive for testifying.

105.    Additionally, the "special role" Reeves had to Maddix, and Reeves's obligations under *Brady/Giglio* and federal law, created the legal equivalent of a fiduciary relationship between Reeves and Maddix.[13]

106.    Prior to December 18, 2024, Maddix did not know:

---

[13] "A prosecutor has a special duty commensurate with a prosecutor's unique power, to assure that defendants receive fair trials." *United States v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000); *Tigano v. United States*, 527 F.Supp.3d 232, 250 (E.D.N.Y. 2021) (Chen, J.) ("The logic of this [case law], that federal officers who undertake to fulfill a certain role toward a criminal defendant owe a duty to that defendant, would seem to apply … to the prosecutors who undertake to pursue charges against individuals[.]")

(a) Of the KCDA's black sites;

(b) Reeves illegally incarcerated DeJesus in one of those black sites and coerced his testimony;

(c) Reeves violated his *Brady/Giglio* disclosure obligations; and

(d) Reeves's trial presentation regarding DeJesus' reasons for testifying was false.

107. The material witness order and warrant Reeves abused to illegally incarcerate DeJesus is not in Maddix's court file.

108. Reeves, the KCDA and Marriott took affirmative steps to prevent Maddix's discovery of the *Brady/Giglio* violations, ¶¶ 252-314, *infra*, and those violations were of such a nature as to be self-concealing.

109. At the time Maddix discovered the *Brady/Giglio* material*,* and as of the date of the filing of this complaint, Maddix is not in custody or on parole.

110. Maddix, through no fault of his own, and due solely to the misconduct of defendants, never had any opportunity to raise his *Brady/Giglio* claims in a federal *habeas* petition. To the contrary, defendants' actions totally precluded Maddix from discovering and raising the *Brady/Giglio* issues in his habeas petition.

111. Maddix was entitled to, and did, rely on Reeves's factual representations.[14]

---

[14]*Banks v. Dretke*, 540 U.S. 668, 695, 693 (2004) ("Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed; the State asserted, on the eve of trial, that it would disclose all *Brady* material …. Banks cannot be faulted for relying on that representation."); *Su v. Filion*, 335 F.3d 119, 128 (2d Cir. 2003) ("[W]hen a prosecutor says that there was no deal and later elicits testimony from a witness denying the existence of a deal, it would be an unreasonable application of federal law, as determined by the Supreme Court, to fault the defendant for not proceeding in his cross-examination on the assumption that the prosecutor is a liar.")

112.    Because Maddix is not in custody or on parole, he has no federal vehicle, other than

a § 1983 action, to obtain federal review of the constitutional violations alleged in this complaint.[15]

113.    Nor is Maddix required to file a CPL § 440.10 motion as § 1983 does not impose

any "exhaustion" requirement.[16]

114.    The City, through the KCDA and conduct attributable to the City's co-conspirators

Marriott, concealed facts it was constitutionally required to disclose and made numerous

---

[15]As such, *Heck v. Humphrey*, 512 U.S. 477 (1994) does *not* bar Maddix's lawsuit. *See e.g. Heck,* 512 U.S. at 500 (applying *Heck* to a non-custodial plaintiff "who discover[s] (through no fault of their own) a constitutional violation after full expiration of their sentences … would be to deny any federal forum for claiming a deprivation of federal rights to those who cannot first obtain a favorable state ruling.") (Souter, J., concurring); *Wiggins v. Mellia*, 2023 WL 6222303, at *2 (2d Cir. Sept. 26, 2023) ("There is … a narrow exception to the *Heck* bar that permits a § 1983 suit where federal habeas relief is unavailable."); *Teichmann v. New York*, 769 F.3d 821, 829-30 (2d Cir. 2014) (Calebrisi, J. Concurring) ("The law in this Circuit … holds … that *Heck* does not bar § 1983 claims when *habeas* is unavailable, at least so long as the unavailability was not intentionally caused by the plaintiff. *See Huang ex rel. Yu v. Johnson,* 251 F.3d 65, 75 (2d Cir.2001); *Green v. Montgomery,* 219 F.3d 52, 60 n. 3 (2d Cir.2000); *Jenkins v. Haubert,* 179 F.3d 19, 27 (2d Cir.1999); *Leather v. Eyck,* 180 F.3d 420, 424 (2d Cir.1999). Indeed, it is only because of these seemingly binding Circuit cases that in *Poventud v. City of New York* the panel majority (as opposed to the *en banc* majority) reached the *Heck*-habeas issue that led to *en banc* consideration in the first place."); *Poventud v. City of New York*, 715 F.3d 57, 62 (2d Cir. 2013) ("[T]he law of this Circuit makes clear that a plaintiff alleging civil rights violations in connection with his conviction or imprisonment must have access to a federal remedy either under habeas or under § 1983. Because Poventud is not in custody, he has no remedy under habeas [for his *Brady* claim]. He must be able, therefore, to pursue relief under § 1983."), *vacated on other grounds on rehearing en banc,* 750 F.3d 121 (2d Cir. 2014); *Brown v. Wagner*, 2014 WL 234821, at *5 (W.D.N.Y. Jan. 22, 2014) ("[T]here is no clearer or more recent precedential pronouncements than those that find '*Heck* acts only to bar § 1983 suits when the plaintiff has a habeas corpus remedy available to him.' The recent *Poventud en banc* decision does not alter this; indeed, the court took pains to emphasize that it expressed no view on the question."); *John v. Lewis*, 2017 WL 1208428, at *7 (E.D.N.Y. Mar. 31, 2017) (Chen, J.) ("It is Second Circuit law that a plaintiff not in State custody, who thus does not have a *habeas corpus* remedy available, may bring a [section] 1983 action, even if a successful claim would 'necessarily imply the invalidity of his conviction.'"); *Chillemi v. Town of Southhampton*, 943 F.Supp.2d 365, 375 (E.D.N.Y. 2013) (Spatt, J.) (noting that "Section 1983 remains a possible remedy when there is no other federal avenue through which to bring a claim" and finding that *Heck* did not bar plaintiff's claims).

[16]*Jenkins v. Herbert*, 179 F.3d 19, 22 (2d Cir. 1999) ("[T]he Supreme Court has consistently held that courts should not impose an exhaustion requirement on § 1983."), quoting *Patsy v. Florida Bd. of Regents*, 457 U.S. 496, 502 (1982); *Heck*, 512 U.S. at 480. ( §"1983 contains no exhaustion requirement beyond what Congress has provided."); *Leather v. Eyck*, 180 F.3d 420, 423 (2d Cir. 1999) (noting that the plaintiff had elected not to appeal his State conviction, went on to uphold his right to pursue money damages under § 1983).

misrepresentations of fact to Maddix, as detailed above, with reason to believe he would rely on them.

115.    Maddix reasonably relied on those misrepresentations to his detriment, and as a result, was unable to raise the *Brady/Giglio* issues in his federal habeas corpus petition.

116.    As a result, the equitable estoppel, fraudulent concealment, fraud on the court, and unclean hands doctrines preclude defendants from invoking the *Heck*[17] and statute of limitations defenses in this action.

## MADDIX'S DAMAGES

117.    Maddix's injuries and damages include, but are not limited to:

(a)    Substantial compensatory and punitive damages for injuries associated with his trial and deception of his jury;

(b)    Substantial compensatory and punitive damages for his 19-year imprisonment and loss of liberty;

(c)    Past and future physical illnesses and injuries resulting from the violation of his constitutional rights;

(d)    Severe trauma and emotional distress;

(e)    The denial of Maddix's right to habeas corpus relief and to petition the courts during his 19-year incarceration;

(f)    Loss of substantial income; and

(g)    The loss of services, society, companionship and consortium of his children, fiancée, sister and other family members and friends.

---

[17]*Hebrard v. Nofziger*, 90 F.4th 1000, 1006 (9th Cir. 2024) ("*Heck* is an affirmative defense that may be … forfeited."); *Vuyanich v. Smithton Borough*, 5 F.4th 379, 389 (3d Cir. 2021); *Colvin v. LeBlanc*, 2 F.4th 494, 498-99 (5th Cir. 2021); *Johnson v. Spencer*, 950 F.3d 680, 697-98 (10th Cir. 2020); *Polzin v. Gage*, 636 F.3d 834, 837-38 (7th Cir. 2011); *Horton v. Schenectady County*, 2023 WL 2552005, at *7 (N.D.N.Y. Mar. 16, 2023) ("[T]he bar in *Heck* is not jurisdictional"); *Scott v. City of Mt. Vernon,* 2017 WL 1194490, *20 (S.D.N.Y. Mar. 30, 2017) (Karas, J.) ("*Heck* is not jurisdictional").

**FIRST CAUSE OF ACTION**
Violation Of Maddix's Fifth and Fourteenth Amendment Rights To
A Fair Trial By Virtue Of Suppression Of *Brady/Giglio* Material;
All Defendants

118.     Maddix repeats the allegations above and incorporates them here and in all following paragraphs.

119.     Reeves, the City and Marriott, individually, collectively, acting in concert, aiding and abetting and conspiring with each other, intentionally, recklessly and with deliberate indifference to Maddix's constitutional rights, suppressed from Maddix and his trial attorney the exculpatory and impeaching information detailed above, all of which was favorable to Maddix's defense.

120.     The suppressed evidence was material, likely to influence a jury's decision, and there is a reasonable probability that had the evidence been disclosed to the defense, the result of Maddix's trial would have been different.

121.     The actions of Reeves, the City and Marriott deprived Maddix of his right to timely disclosure of all material evidence favorable to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny, and the Due Process and Fair Trial Clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution.

122.     The foregoing violations of Maddix's federal constitutional rights by Reeves, the City, Marriott and their co-conspirators and accomplices, known and unknown, directly, substantially, proximately and foreseeably caused Maddix's loss of liberty, wrongful conviction, subsequent imprisonment and other injuries and damages.

123. The foregoing violations of Maddix's rights amount to constitutional torts and were affected by actions taken under color of State law and within the scope of Reeves's employment and authority.

124. Reeves, the City and Marriott committed the foregoing violations of Maddix's rights knowingly, intentionally, willfully, recklessly and/or with deliberate indifference to Maddix's constitutional rights or to the effect of such misconduct on those rights.

125. The City is liable for these wrongs by virtue of (a) the KCDA's training, policies, customs and practices, including the failure to supervise and discipline its employees regarding such conduct, and to cover-up such conduct, and (b) the City's participation in a civil conspiracy, concerted action and aiding and abetting Reeves and Marriott, following Maddix's conviction, to continue the suppression of this *Brady/Giglio* material. *See infra* (*Monell* claims against the City).

126. Marriott is liable for these wrongs by virtue of Marriott's policy, custom and practice, direct participation in, and knowing facilitation and aiding and abetting of the KCDA's illegal imprisonment of witnesses as prisoners, and serving as a KCDA black site. *See infra* (*Monell* claim against Marriott).

127. By reason of the foregoing, the City and Marriott are liable to Maddix for the damages detailed in ¶ 117, above, and Reeves for declaratory relief.

## SECOND CAUSE OF ACTION
First Amendment Backwards-Looking Denial Of Access To The Court, *Heyliger v. West*, 2022 WL 3020967, at *10 (N.D.N.Y. May 31, 2022), *report and recommendation adopted*, 2022 WL 3017368 (N.D.N.Y. July 29, 2022); *Jackson v. City of Cleveland*, 64 F.4th 736, 749 (6th Cir. 2023); Defendant Reeves

128. Maddix repeats the allegations above and incorporates them here.

129. The actions of Reeves, The City and Marriott, individually and collectively, deprived Maddix of his First Amendment right of access to the courts to litigate his non-frivolous

federal *habeas corpus* petition (from 1999 to 2012) and state court CPL § 440.10 motion (from 1994 to December 2024), based on the violation of his constitutional rights to *Brady/Giglio* material.

130.     The defendants' cover-up and suppression of the *Brady/Giglio* in Maddix's case following Maddix's conviction, including during his state CPL § 440.10 proceeding and federal *habeas corpus* proceeding, was so severe as to deny him any state or federal review of his *Brady/Giglio* claims (from 1994 to 2024), and to render hollow his right to seek redress *via* state post-conviction relief or federal habeas corpus.

131.     Maddix's unrealized state postconviction and federal *habeas* claims based on the suppression of *Brady/Giglio* issues were nonfrivolous, arguable, likely to prevail, and would have resulted in overturning of his state court conviction, and spared Maddix at least 13 years in prison and additional years on parole.

132.     The defendants' actions hindered and totally precluded Maddix from pursuing the *Brady/Giglio* claim *via* state post-conviction proceedings and federal habeas corpus.  But for defendants' acts and omissions, Maddix would have raised the *Brady/Giglio* claims in his CPL ¶ 440.10 motion and/or federal habeas corpus petition.

133.     Reeves, the City and Marriott committed the foregoing violations of Maddix's rights knowingly, intentionally, willfully, maliciously, deliberately, recklessly and/or with deliberate indifference to Maddix's constitutional rights or to the effect of such misconduct on those rights.

134.     The defendants' actions resulted in actual, substantial and severe injury to Maddix (¶ 117, *supra*).

135.     The defendants' actions resulted in substantial prejudice to the underlying claims during the relevant period (from 1994 to 2024) that cannot now be remedied by the state court.

136.     Maddix has no available state court remedy to recover damages for, or to be made whole from the denial of, state-post conviction and federal *habeas* relief from 1994 to 2024, his delayed release and exoneration, prolonged incarceration and relief for the denial of those rights during that particular time period is now unattainable.

137.     Maddix's claims against the City and Marriott are *not* the same as his First Amendment claim against Reeves based on his personal, post-conviction obstruction of Maddix's right of access,[18] and any relief Maddix may yet obtain would not encompass relief for being denied his right to access the courts.  Moreover, Maddix's backward looking right of access claim provides a remedy that may be awarded that is not otherwise available in some suit that may yet be brought, specifically, a  declaratory judgment that Reeves violated Maddix's First Amendment right of access to the court by personally failing to disclose the *Brady/Giglo* material during Maddix's direct appeal, CPL § 440 and *habeas* proceedings.

138.     By reason of the foregoing, Reeves violated Maddix's First Amendment rights and Maddix is entitled to a declaratory judgment.

### THIRD CAUSE OF ACTION
Fifth And Fourteenth Amendment Substantive Due Process Claim
For Defendants' Coverup; All Defendants

139.     Maddix repeats the allegations above and incorporates them here.

140.     The actions of Reeves, The City and Marriott, individually and collectively, in covering up the *Brady/Giglo* material following Maddix's conviction and depriving him of an

---

[18]*Wilson v. Est. of Burge*, 667 F. Supp.3d 785, 841 (N.D. Ill. 2023) (prosecutor who was no longer involved in defendant-plaintiff's criminal case had a continuing obligation to disclose exculpatory material).

opportunity to challenge his conviction on those grounds, violated Maddix's substantive due process rights to life and liberty.

141. Maddix had a Fourteenth Amendment life and liberty post-conviction interest in accessing *Brady/Giglio* material, demonstrating his conviction was unlawfully obtained by suppression of that material, petitioning the court, and collaterally challenging his conviction. CPL Article 440; *Steidl v. Fermon*, 494 F.3d 623, 630 (7th Cir. 2007).

142. Reeves', The City's, and Marriott's actions deprived him of those rights. Those defendants' actions were so egregious, so outrageous, that they shock the contemporary conscience and were a gross abuse of governmental authority.

143. Those defendants' arbitrary abuse of government power was intended only to oppress Maddix, deny him the ability to lodge valid, non-frivolous, challenges to his conviction, access suppressed *Brady/Giglio* material, expose governmental misconduct, and served no legitimate governmental purpose.

144. Those defendants' actions were intentional, deliberately indifferent, arbitrary, irrational and/or motivated by bad faith.

145. Those defendants' actions resulted in actual, substantial and severe injury to Maddix (¶ 117, *supra*).

146. The City is liable for these wrongs by virtue of (a) the KCDA's training, policies, customs and practices, aimed at covering-up such conduct, and (b) the City's participation in a civil conspiracy, concerted action, and aiding and abetting Reeves and Marriott, following Maddix's conviction, to continue the suppression of this *Brady/Giglio* material.

147. Marriott is liable for these wrongs by virtue of Marriott's policy, custom and practice, direct participation in, civil conspiracy, and knowing facilitation and aiding and

abetting of the KCDA's secret, illegal imprisonment of witnesses as prisoners and serving as a KCDA black site, and maintaining the secrecy of that practice.

148.    By reason of the foregoing, the City and Marriott are liable to Maddix for the damages detailed in ¶ 117, above.

## FOURTH CAUSE OF ACTION

*Monell* Claim based on the KCDA's unconstitutional training, policies, customs and practices, and failure to supervise, discipline and rectify amounting to deliberate indifference; Defendant City

149.    Maddix repeats the allegations above and incorporates them here.

150.    The foregoing violations of Maddix's constitutional rights were proximately caused by the training, policy, customs and practices of Charles J. Hynes, the Kings County District Attorney from 1990 to 2013.   Hynes, who campaigned for office on a "get tough on crime" platform, took office on January 1, 1990, and throughout his tenure instituted a series of no-holds-barred, anything goes, scorched earth training and policies.

151.    Hynes's training and policies were aimed at winning convictions at any cost, including by suppressing exculpatory evidence and using false testimony, coercing witnesses to provide testimony the office desired, irrespective of its truth or falsity and disregarding any collateral damage inflicted in the process.

152.    Hynes's attitude and approach metastasized throughout the office, from his executive staff to line prosecutors, and by his training, policies and actions communicated to his staff that as long as they won convictions, he had their back, irrespective of the means by which they secured those convictions.

153.    Specifically, during the entirety of Hynes's administration, Hynes maintained affirmative or *de facto* officewide, facially unconstitutional training, policies, customs and

practices that evinced deliberate indifference to the constitutional rights to due process and a fair

trial under the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution, of defendants

who were investigated, arrested, or prosecuted by that office, including:

(a)     Refraining from making any record of false or inconsistent out-of-court statements of prospective prosecution witnesses in order to avoid creating "*Rosario* material" that would have to be disclosed to the defense under State law, even though this policy also resulted in prosecutors ultimately not disclosing the same information as *Brady* material. Indeed, under the KCDAs "riding" program, prosecutors were permitted and encouraged to make a record of statements that tended to inculpate a suspect or defendant, while ignoring statements that were inconsistent with their belief about the suspect's or defendant's guilt, or the office's narrative of the case,

(b)     The improper manipulation of witnesses and creation of false or inherently unreliable testimony, through physical and psychological coercion, threats, unlawful detentions and promises of rewards,

(c)     The toleration of police and detectives who used such practices, especially those handling homicide and other high-profile cases,

(d)     Withholding prosecution witnesses' pretrial recantations and other evidence if the prosecutors disbelieved, or at least claimed to disbelieve, the recantations, a blatant violation of *Brady* which requires any *objectively* favorable information to be disclosed to the defense,

(e)     The maintenance of an illegal "office-subpoena" practice, repeatedly condemned by New York courts, whereby subpoenas were used to coerce witnesses into meeting with prosecutors at the KCDA, and if the witnesses refused to appear, they would be brought to the KCDA against their will,

(f)     The maintenance of an illegal material witness warrant practice, whereby material witness warrants were obtained with false affirmations and, instead of bringing witnesses to court "forthwith" as required under New York law, material witness warrants were used to force witnesses to meet with prosecutors at the KCDA, and circumvent the witness's statutory right to counsel. Moreover, both the detective-investigators and the prosecutors who obtained the material witness warrant would affirmatively lie to the witness that the only choice the witness had was to go to jail or "agree" to be held in the KCDA's

custody, when as a matter of law, the witness was entitled to an evidentiary hearing, had the possibility of being ordered released, and the court was mandated to grant the witness a reasonable bail if detention was ordered,

(g)      The maintenance of an illegal "Hotel Custody Program," in which the KCDA, with no legal authority to do so, kidnapped and  imprisoned recalcitrant witnesses to coerce them into testifying, deprived them of their statutory right to counsel, and held them *incommunicado* in hotel rooms as prisoners, with their hotel doors shackled, guarded by detective-investigators, and without the ability to use a telephone or have visitors without the KCDA's permission,

(h)      The maintenance of an illegal "order to produce" practice, by which prosecutors would obtain court orders to unilaterally have inmates produced from jail or prison to the courthouse, purportedly to have them appear as witnesses when, in truth, the cases for which the inmates were produced were not being heard, the prosecutors' claims otherwise were false and the attorney affirmations used to obtain the orders to produce were counterfeit ones which had been actually signed by a paralegal,

(i)      The abuse of *Damiani* orders to coerce defenseless inmates into testifying against criminal defendants by (1) submitting false affirmations to the court purporting to have been affirmed to and signed by prosecutors but which were actually signed by a Homicide Bureau paralegal (2) falsely representing in those "affirmations" that the target inmates asked to speak with the KCDA when, in truth, they had not and the prosecutors were unilaterally producing the inmates to the KCDA, (3) falsely representing to the court that the inmates would not be produced to the KCDA unless they consented, but then do nothing to honor that promise or ensure that the inmates consented to the production, and many times produce   those inmates without their consent or against their will and (4) not disclosing any of these circumstances to the defendants the inmates testified against,

(j)      The secret practice of causing Corrections and State Division of Parole officials to revoke the release of former inmates to compel them to appear at the KCDA and to compel them to "cooperate,"

(k)      The withholding from criminal defendants favorable evidence under *Brady* and its progeny, including the KCDA's abuse of process to secure testimonial evidence, and

   (l)  The knowing or reckless use of, reliance on, and failure to correct false, misleading, or inflammatory evidence and argument, including during summations.

  154. The existence, from 1990 to 2013, and for a time thereafter under the subsequent administration, of the training, policies, customs and practices identified above in ¶ 153 (a), (c), (d), (e), (f), (g), (h), (i) and (j) is established by sworn *admissions* of former KCDA prosecutors, KCDA records and/or admissions by Hynes himself during his December 13, 2013, videotaped deposition in the Jabbar Collins case.[19]

  155. The existence of these practices is also established by the civil complaints in *Collins v. City of New York, et.*, 11 CV 766 (FB) (RML)(E.D.N.Y.)(Doc. No. 1), *Quezada v. City of New York*, 16 CV 6577 (MKB)(SMG)(E.D.N.Y.) (Doc. No. 8) and *Cooper v. City of New York, et. al.*, 21 CV 4171 (ENV)(JAM)(E.D.N.Y.) (Doc. No. 1), all three of which we incorporate here and in all following paragraphs. All three of the plaintiffs in those cases were prosecuted by the Hynes administration around the same time as Maddix, and all three plaintiffs were victimized by ADAs following Hynes's unconstitutional and illegal training, policies, practices and customs detailed in Maddix's complaint.

---

[19] *See e.g.* Deposition of Charles J. Hynes in *Collins v. City of New York*, 11 CV 766 (FB) (RML), December 13, 2013 (admitting to Hotel Custody Program and practice of not taking notes); Deposition of Theresa Corrigan in *Zahery v. City of New York,* 98 CV 4546 (LTS) (admitting to pretrial witness recantation practice); Hearing Testimony of Senior Homicide Prosecutor Stan Irvin during CPL § 440.10 Hearing in *People v. Tasker Spruill*, Ind. No. 13008/95, July 1998, (admitting to *Damiani* practice); Deposition of KCDA Supervising Homicide Bureau Paralegal Liza Noonan Fitzpatrick in *Collins v. City of New York*, 11 CV 766 (FB) (RML), May 10, 2013, pp. 53-56 (admitting to counterfeit affirmation and office subpoena practice); KCDA's Appellant's Brief in *People v. Tasker Spruill*, Kings Co. Ind. 13008/95, pp. 24, 26-27 (conceding that "[t]he practice in the [DA's] Office at the time was for the paralegal to sign the ADA's name on the paperwork."); Deposition of KCDA Detective-Investigator Christopher Salsarulo in *Quezada v. Brown*, 08 CV 5088 (KAM) (VVP) (E.D.N.Y.), January 19, 2012, pp. 40-41, 65-67 (admitting to abuse of material witness warrants); Deposition Transcript of Supervising Detective-Investigator Stephen Bondor in *Collins v. City of New York*, 11 CV 766 (FB) (RML), November 4, 2013, p. 50 (explaining the factual representations that would be made to material witnesses); Affirmation of Monique Ferrell in Opposition to Defendant's CPL 440.10 Motion in *People v. Collins*, Ind. No. 2884/94, Nov. 3, 2006, p. 41 (discussing the KCDA's "usual practice" of causing work release or parole to revoke the release of uncooperative former inmates); **Exhibit M** (Riding Memo).

156. Moreover, much of the DA's training, in the form of the DA's In-House Continuing Legal Education ("CLE") courses, most of which were taught by office prosecutors, videotaped and accompanied by written memoranda, establish the existence of the unconstitutional training, policies, customs and practices identified above in ¶ 153 (a), (c), (d), (e), (f), (g), (h), (i) and (j) above.

157. For example, a CLE in effect at the time of Maddix's 2014 trial by the DA's Director of Legal Training, Catherine Dagonese, *Case, Witness & Trial Preparation Tips for New Prosecutors* (2014) (**Exhibit N**), establishes the KCDA's officewide policy of maliciously abusing criminal process through the use of illegal office subpoenas. *See Rodrigues v. City of New York*, 193 A.D.2d 79, 86 (1st Dep't 1993) (prosecutor may not use a subpoena to force witness to appear at his office).

158. Despite the illegality of these office subpoenas, in the 2014 CLE the KCDA's *Director of Legal Training* provided a "Checklist" instructing line prosecutors that before announcing ready for trial, they should be prepared to discuss with their supervisors *whether they issued office subpoenas for their witnesses*. **Exhibit N** at p. 4 ("Have you sent 'Come See Me Letters?'").

159. The CLE was an official written policy under *Monell*[20] and shows the use of these "fraudulent" and unethical office subpoenas was taught and authorized by the highest levels of the DA's Office.

---

[20]*Montero v. City of Yonkers, New York*, 890 F.3d 386, 403 (2d Cir. 2018) ("[O]fficial policy often refers to formal rules or customs that intentionally establish fixed plans of action over a period of time[.]") (Quotation marks omitted). The DA's Office created Videotaped Self-Study CLEs on virtually all of the tactics employed by Reeves in Maddix's case. *See e.g.* Riding: Taking Statements (Library Index No. 143); Riding Homicide Case (145); Riding: Basic Policies, Procedures, Paperwork & Policies (187); Talking to Police Officers: Preparing Witnesses for Testimony (201); Hostile & Uncooperative Witnesses, 5/12/99; Custody Relocation Training, 2/23/09.

160.     The unconstitutional training and policies identified above in ¶ 153 (a), (b), (c), (e), (f), (g), (k) and (l) were followed by Reeves and applied in Maddix's case, and along with Reeves's intentional suppression of *Brady* material[21] and knowing use of false evidence and argument, directly caused Maddix's constitutional injuries.

161.     The unconstitutional policies identified above, and those of suppressing *Brady* material, knowingly using false or misleading evidence and argument and improper and inflammatory summation, are established by:

   (a)     Seventy-eight cases set forth in finding prosecutors violated *Brady,* knowingly used false or misleading evidence and made improper summation arguments, (attached as **Exhibit O**),

   (b)     Hynes's decision to reward most of the prosecutors who committed that misconduct rather than taking any steps to rectify it,

   (c)     The maintenance of the office-wide practice of *deceiving* judges in criminal cases with false *Damiani*, material witness, and order to produce affirmations, and failing to disclose that deception to defendants, and

   (d)     The maintenance of the office-wide practice of using office subpoenas, conduct that "constituted fraudulent conduct[.]" *Matter of Rain*, 162 A.D.3d 1458, 1459 (3d Dep't 2018).

162.     Additionally, the KCDA's Office recently admitted that in the two decades preceding Maddix's trial, the use of false evidence and suppression of *Brady* material were institutional failures of the Hynes administration, and resulted in at least 25 wrongful convictions. *See* Kings County District Attorney's Office, *426 Years: An Examination of 25 Wrongful Convictions in Brooklyn*, New York, July 9, 2020, p. 14 ("Taken together, the wrongful convictions discussed here all point to failures of the prosecution as an institution —whether through acts of individual prosecutors, collective decisions, or *failure to train or guide prosecutors*

---

[21]A "plaintiff is allowed to plead in the alternative." *Breton v. City of New York*, 404 F.Supp.3d 799, 814 (S.D.N.Y. 2019) (Koeltl, J.), citing Federal Rule of Civil Procedure 8(d).

*adequately.*") (emphasis added); p. 60 ("In many of the cases, prosecutors … failed to disclose important relevant evidence.  And, in a number of cases, prosecutors failed to adhere to expectations of candor and diligence, thereby denying the defendants a fair trial.").[22]

163.    Hynes's policy of suppressing *Brady* material is also demonstrated by his *personal suppression* of *Brady* material—in full view of executive staff—in the high-profile Samuel Kellner prosecution in 2011, the same year Maddix's case began.  *See e.g.* CBS News, *Samuel Kellner Accused Of Paying False Witness $10K To Testify In Rabbi Abuse Case* ([https://www.cbsnews.com/newyork/news/man-accused-of-paying-false-witness-10k-in-testify-in-rabbi-abuse-case](https://www.cbsnews.com/newyork/news/man-accused-of-paying-false-witness-10k-in-testify-in-rabbi-abuse-case)), April 13, 2011.

164.    In 2008, Kellner's 16-year-old son told him that Baruch Lebovits, a prominent Hasidic cantor, molested him in a car.  Kellner went to prosecutors but was told that a trial was unlikely because of the nature of the touching and the age of his son.  So, he began working with a sex crimes detective to find other victims who were more seriously violated.

165.    Kellner's efforts were successful: A young man testified that Lebovits had serially molested him, and Mr. Lebovits was sentenced to 10 to 32 years in prison.

166.    In 2011, however, Kellner was arrested based on evidence collected by supporters of Lebovits.  He was indicted on charges related to paying $10,000 to the young man to falsely tell a grand jury that he was abused by Lebovits. Kellner was also charged with attempting to extort $400,000 from Lebovits's family by telling them he could convince the witness not to testify.

167.    Unbeknownst to Kellner, Lebovits's attorney, in an attempt to secure Lebovits a non-jail disposition, admitted to the DA's Office that Lebovits did in fact molest the young man.

_____

[22]*See* [http://www.brooklynda.org/wp-content/uploads/2020/07/KCDA_CRUReport_v4r3-FINAL.pdf](http://www.brooklynda.org/wp-content/uploads/2020/07/KCDA_CRUReport_v4r3-FINAL.pdf).

This was critical *Brady* material for Kellner because he could not be guilty of paying to fabricate allegations of abuse by Lebovits when Lebovits confessed to committing that very abuse.

168.    Moreover, Lebovits's attorney engaged a forensic psychiatrist, Dr. Goldstein, to prepare a detailed report alleging "the sexual acts were all consensual without force or coercion" and "Lebovits's deviant sexual behavior was compulsive in nature. He had difficulty resisting temptation and controlling his sexual impulses at the time. The relief and gratification his behavior afforded him were short-lived and quickly followed by extreme guilt, contrition and depression at his loss of control." The report was submitted to the KCDA's Office *two years before Kellner was even indicted.*

169.    On July 3, 2013, Kellner's attorneys wrote the KCDA demanding production of any such *Brady* material: "I will be asking for a representation in open court that Baruch Lebovits did not at any time … indicate a willingness, through counsel, to plead guilty in respect of offenses committed against [the victim] (in exchange for an agreeable disposition) …. Obviously, the withholding of information to this effect would constitute a grave violation of your *Brady* obligations." **Exhibit P**.

170.    In response, *Hynes personally edited* a July 5, 2013, response letter, **Exhibit Q**, that concealed Dr. Goldstein's critical report. *See* **Exhibit R** (Email of Chief of Trials Joseph Alexis to Rackets Division Chief Michael F. Vecchione, July 2, 2013): "I worked in the DA's revisions."

171.    Hynes's suppression was undertaken in full view of his executive staff, and he then had two of those staff members present his misleading letter to Kellner's attorney. Dr. Goldstein's report was thus suppressed throughout the entirety of Kellner's criminal case.

172.    It was not until Kellner brought a civil lawsuit three years later, after his criminal case was dismissed, that Kellner finally learned of the existence of Dr. Goldstein's report through

civil discovery.  *See Kellner v. The City of New York, et al.*, 17 CV 01268 (E.D.N.Y.) (NRM) (MMH).

173.    Hynes's deliberate indifference to the violation of defendant constitutional rights by his employees is also demonstrated by his failure to investigate, supervise and discipline prosecutors for their pattern of violating the rights of criminal defendants through the knowing use of false evidence, suppression of evidence required to be disclosed under *Brady* and its progeny, coercion of witnesses and false or misleading summation arguments.

174.    Hynes's deliberate indifference in that regard effectively encouraged those employees to commit those acts and created an "anything goes" atmosphere that caused such violations to continue, including those in Maddix's case.

175.    In that regard, Hynes and his top lieutenants, his counsel, Dino Amoroso, his Chief of investigations and former Chief of the Homicide Bureau Michael Vecchione, his Chief Assistant, Amy Feinstein and numerous other ADAs and supervisors, admitted in sworn depositions in *Collins v. City of New York*, *et. al*, 11 CV 766 (FB) (RML) (E.D.N.Y.), *Zahrey v. City of New York,* No. 98 Civ. 4546, 2009 WL 54495 (S.D.N.Y. Jan. 7, 2009) and other cases, that Hynes and the KCDA had no written *Brady* disclosure policy, no formal rules of behavior governing how cases would be prosecuted and when (if ever) discipline for misconduct would be warranted, and no formal disciplinary system for investigating or disciplining prosecutors who violated the rights of criminal defendants.

176.    While Hynes maintained an Employee Manual governing relatively minor issues such as the use of office equipment and time sheets and penalties for violating those policies, there were no written standards by which prosecutors' conduct during the course of criminal cases would be assessed for discipline, much less any possible penalty that could be imposed.

177.    The KCDA representatives above testified that the KCDA's informal disciplinary "procedure" was for Hynes himself to review all criticisms or complaints about prosecutors. They testified, under oath, that while dozens of court decisions documenting the misconduct of KCDA prosecutors were brought to Hynes'sattention, Hynes failed to report the offenders to outside attorney disciplinary bodies.

178.    A list of 78 cases in the 24-year period preceding Maddix's January 2014 trial gave Hynes notice of the need to investigate, supervise and discipline his prosecutors and investigators with respect to their handling of their *Brady* obligations. *See* **Exhibit O**. Yet, the KCDA representatives shockingly testified *there was not a single instance in which Hynes directed that any internal disciplinary investigation be conducted, let alone that any discipline be imposed.*

179.    To the contrary, KCDA's personnel records establish Hynes and his managerial staff almost invariably gave good evaluations, recommendations, promotions and pay raises to prosecutors they knew had been alleged or found to have engaged in such misconduct, recommended some of them for judgeships and others for awards and otherwise ratified the misconduct by aggressively defending it even after it was exposed.

180.    When Hynes received letters from the public or public officials praising his prosecutors, Hynes *personally* wrote to the prosecutors informing them that he received the complimentary report and praised the prosecutors. In contrast, when prosecutors' conduct in their handling of a criminal case was criticized, Hynes ignored the possible misconduct, never investigated the possible misconduct and never confronted the prosecutor about the alleged behavior.

181.    Likewise, while Hynes's complimentary letters were included in the prosecutors' personnel files, no notation would be made about any of the complaints or evidence of the prosecutors' wrongdoing.

182.    When a court explicitly found that a prosecutor committed misconduct, no record was kept in the prosecutor's personnel file of the finding or in a central file, making it virtually impossible to track repeat offenders or to take a prosecutor's behavior into account before transferring the prosecutor to bureaus where the consequences of such misconduct were at their highest.

183.    Despite dozens of court decisions finding prosecutors wrongfully failed to disclose evidence actually or potentially favorable to the defense that should have been disclosed under *Brady*, *Giglio, Rosario*, or statutorily mandated discovery procedures, or otherwise had engaged in conduct that misled the court, the jury and/or defense, none of the prosecutors involved were ever disciplined. *See* **Exhibit O**.

184.    The KCDA personnel files of the prosecutors in the 78 cases listed in **Exhibit O** where prosecutorial misconduct was found from between 1989 through 2013 reveal no documentary evidence of disciplinary action ever being taken against the prosecutors, no notations of their misconduct and Hynes conceded during his deposition testimony in the Jabbar Collins case that he took no remedial action with respect to such conduct.

185.    Moreover, prosecutors who courts found to have committed misconduct were placed in supervisory and training positions over new ADAs, essentially ensuring that improper practices would be repeated.

186.    Despite the 78 judicial findings of misconduct detailed in **Exhibit O**, not once during Hynes's 24 years in office did he ever terminate a prosecutor for prosecutorial misconduct.[23]

187.    Against this backdrop of the lack of a disciplinary infrastructure, Hynes kept win/loss statistics, making a prosecutor's conviction rate a key factor in his or her ability to advance their career within the office.

188.    Hynes also communicated to his executives his indifference to wrongfully prosecuted defendants by referring to even *innocent* defendants who had been wrongfully imprisoned as the dehumanizing term "mutts," and seeking to protect the prosecutor who wrongfully incarcerated them.

189.    In that regard, Damien Crooks was one of four men arrested in 2011—the same year the Maddix prosecution began—for allegedly repeatedly raping and prostituting a woman from Crown Heights for nearly a decade. Following the arrest, Crooks and his codefendants were defamed in the press and held on Rikers Island for nearly a year.

---

[23]Indeed, Hynes's rampant violations of the New York Conflict of Interest Law virtually ensured he would never deal with prosecutorial misconduct seriously, as disciplining errant prosecutors could lead to public disclosure of his own misconduct. Hynes and eight members of his executive staff admitted that in their efforts to assist Hynes's 2013 election campaign, they each violated New York City Charter § 2604, conduct constituting a Class A misdemeanor (misusing City resources). *R.A.C. Group v. Board of Educ. of City of New York*, 21 A.D.3d 243, 247-248 (2d Dep't 2005) ("A person who violates New York City Charter § 2604 is guilty of a misdemeanor, and forfeits his or her public office or employment upon conviction[.]"); Penal Law § 55.10 (2)(b) (providing any misdemeanor defined outside of that statute without specification "shall be deemed a class A misdemeanor"). Hynes and his executive staff each admitted in detailed stipulations to the New York City Conflict of Interest Board that between 2012-2013—while Maddix's case was pending—that they violated § 2604 of the New York City Charter by using City resources, time, or equipment to help Hynes in his effort to win reelection (by fending off public criticism of his wrongful convictions). Hynes was fined $40,000 (the highest fine in NYC history for such conduct), Amy Feinstein, Chief Assistant District Attorney ($4,500 fine), Dino Amoroso, Deputy District Attorney ($4,500 fine), Henna White, Community Liaison to Orthodox Jewish Community ($4,000 fine), Anne Swern, First Assistant District Attorney ($2,000 fine), Lance Ogiste, Counsel to Hynes ($1,000 fine), Michael F. Vecchione, Chief of the Rackets Division ($1,000 fine), Marc Fliedner, Executive District Attorney ($800 fine), and Mary Hughes, Confidential Assistant District Attorney ($600 fine). Yet even after Hynes's executives admitted to committing these acts, Hynes publicly declared they "did nothing wrong."

190.     However, nine months *after* the defendants were indicted, the fact that the woman had fully recanted her accusations *before* the case was even presented to the grand jury came to light. The woman admitted to police and prosecutors that she was a prostitute, that she was not raped, that any sex was consensual and that she actually liked Crooks. The KCDA's Office also learned the woman had significant psychiatric issues, which made her likely to fabricate including, among other things, mood disorder, bipolar disorder, personality disorder, schizophrenia and hallucinations. None of this information was disclosed to the four defendants or their attorneys during the nine months the defendants were incarcerated at Rikers.

191.     Following revelation and intense media coverage of this suppression, Hynes defended the trial prosecutor's non-disclosure in a draft press release asserting *Brady* did not require the exculpatory information to be disclosed at such an early stage of the case (*nine months* after the defendants were indicted and incarcerated).

192.     When Hynes's advisors counseled him not to release the statement, Hynes convened an internal "ethics panel" that cleared the prosecutor of wrongdoing "because def[ense] counsel received all the disclosures well before trial — so no harm no foul." **Exhibit S** (ADA Rebecca Gingold's June 7, 2012, Memo to Michael Vecchione in *People v. Crooks*, p. 4 at 5/24/12 Time Line Entry).

193.     Even when the need to dismiss the case against these innocent defendants was inescapable, Hynes emailed his Chief of Rackets asking if "these two mutts" admitted to consensual sex with the complainant. **Exhibit T** at p. 2. It was only when Hynes was reminded

that the complainant was a "totally unbelievable woman[,]" *id.,* that he authorized dismissal of the charges.[24]

194.    The above policies, customs and practices, collectively referred to here as the "Hynes Trial Policies," caused Maddix's wrongful arrest, prosecution and conviction.

195.    A number of cases handled by Hynes's office during the time period preceding Maddix's arrest and prosecution illustrate Hynes's Unconstitutional Trial Policies in action.

196.    Shortly after Hynes assumed office in 1990, he defended the wrongful conviction secured by his predecessor in the infamous Waldbaum's Supermarket Fire case in which six New York City firefighters died.  Hynes's predecessor convicted a man named Eric Jackson of a purported "arson" that killed the firefighters and convinced the court to sentence Jackson to 25 years to life.

197.    However, the trial court vacated the conviction based on the KCDA's admission that homicide prosecutor, Jon Besunder, suppressed *Brady* material from Jackson including the opinion from a fire expert that the fire was accidental, that the Fire Department likely fabricated the arson to ensure the firefighters' families received greater death benefits and that there was evidence that undercut Jackson's confession.

198.    In June 1990, the Appellate Division affirmed the trial court's decision to vacate the conviction based on Besunder's suppression of this devastating *Brady* material.

---

[24]Hynes's indifference to his subordinates' conduct and backing them no matter what, extended beyond their misconduct in handling criminal cases.  Hynes and other executives in the office knew that his homicide chief, Michael Vecchione, had a sexual relationship with Vecchione's subordinate, Stacey Frascogna, and had promoted her.  DA payroll records show that Ms. Frascogna was earning $33,000 in 1995 but, within three years of her trip to Puerto Rico to locate a witness in the Jabbar Collins case, Frascogna was promoted to Deputy Bureau Chief and was earning an annual salary, with bonuses, of $105,500.00. Vecchione publicly admitted the Frascogna relationship but denied that it was going on at the time he took her to Puerto Rico.  Nevertheless, Hynes took no action and conducted no investigation of Vecchione's conduct.

199.    Just a month after the Appellate Division's affirmance, however, Hynes promoted

Besunder to First Deputy Chief of the KCDA Homicide Bureau.  Besunder testified at a deposition

in the Jabbar Collins civil rights lawsuit that neither Hynes nor anyone from the KCDA ever

questioned him about the Jackson case, or even brought up his conduct in the case before or after

promoting him.  *See* Deposition of Jon Besunder in *Collins v. City of New York*, 11 CV 766, April

19, 2013, pp. 136-137.

200.    Following the KCDA's appeal, Jackson's case was remanded for an evidentiary

hearing, during which the trial court explicitly found Besunder's testimony at the hearing was

"evasive and disingenuous." *People v. Jackson*, 154 Misc.2d 718, 722 (Sup Ct. Kings Co. June 12,

1992).

201.    Yet even after this additional finding, Besunder was never questioned, disciplined

or sanctioned.  Instead, Besunder continued in his supervisory position and was later appointed

Executive DA, training younger ADAs on the Riding Program that was designed to, among other

things, avoid creating a record of evidence a defendant could use to challenge his conviction.

202.    In February 1992, Hynes communicated to his employees his views about witness

coercion and abusing court process by vigorously defending the murder conviction his office

obtained in *People v. Russ*, 79 N.Y.2d 173 (1992).  The case was built on the testimony of two

teenage girls who, before trial, recanted their statements to police and to the grand jury. When one

of the girls, Ms. Lawrence, testified that she had not seen the defendant commit the crime and then,

in the midst of being challenged by the prosecutor, invoked her Fifth Amendment right against

self-incrimination, the following astounding events occurred:

> [T]he prosecution interrupted Lawrence's midafternoon testimony
> and obtained a continuance.  Lawrence, then 17 years old, was (1)
> arrested; (2) charged with perjury; (3) taken in handcuffs crying and
> frightened to the District Attorney's office; (4) interrogated and

threatened with 2 to 7 years in prison; (5) removed to Central Booking for fingerprinting; (6) held until 5:00 A.M. the next morning without sleep; (7) moved to a precinct lockup; and (8) returned to court at 9:00 A.M. where she was kept in handcuffs except for her time on the stand. Lawrence's post-arrest and post-incarceration testimony, tending to inculpate defendant by describing his role in the mugging, resulted immediately in the perjury charges being dropped. She was only then released from police custody.

*Russ*, 79 N.Y.2d at 176-77.

193.    In reversing the conviction, the court condemned the "egregious" behavior of the KCDA in "legally coerc[ing] [Lawrence's] testimony." *Id* at 178. (citing *Rochin v. California*, 342 U.S. 165, 172 (1952) ("conduct that shocks the conscience"). That the jury heard what had occurred and could judge the witness' credibility was "not adequate," the court emphasized.

194.    In 1993, Ruddy Quezada was convicted based on the testimony of star witness Sixto Salcedo. During trial, the prosecutor portrayed Salcedo as a voluntary witness with no reason to lie. Years later, however, Salcedo recanted his trial testimony, explaining that he had been arrested on a material witness warrant and held against his will at a hotel by the KCDA's Office. (Civil complaint in *Quezada v. Hynes*, *et. al.*, 16 CV 6577 (MKB) (SMG) (Doc. No. 1) (E.D.N.Y.), which we incorporate here and in all following paragraphs).

195.    A high-level appellate prosecutor scoffed at Quezada's claims, arguing they were untrue, there was absolutely no evidence to support them, and there was "no copy of a material witness order in the file." The trial prosecutor, who was by then a supervisor in the KCDA, denied any knowledge of the material witness warrant as well.

196.    Years later, when a federal *habeas* court ordered discovery, the KCDA produced the supposedly non-existent material witness warrant and hotel custody records confirming

Salcedo's account.  The material witness warrant was obtained by the very trial prosecutor who swore under oath that he had no knowledge of it.

197.    The case was remanded to state court, and Hynes took the incredible position that the KCDA's suppression and misrepresentations regarding the material witness warrant and hotel custody did not constitute a *Brady* violation or entitle Quezada to any relief.

198.    During discovery in state court, the KCDA disclosed an email establishing the appellate prosecutor who claimed there was no material witness warrant in the file, like the trial prosecutor, had personal knowledge of the warrant long before she made her false representations.

199.    Yet Hynes neither investigated nor disciplined the trial or appellate prosecutors or acknowledged their conduct violated Quezada's right to due process.  Instead, he continued to defend their conduct and the conviction secured through their suppression.

200.    It was not until the new Kings County District Attorney, Kenneth Thompson, was elected in 2013 that the KCDA began to turn the page from the Hynes Era.  The KCDA fired the appellate prosecutor and consented to vacatur and dismissal of all charges against Quezada.[25]

201.    Hynes's acquiescence to such misconduct as a matter of policy is also demonstrated by his failure to sanction outrageous misconduct by ADA Mark Hale, a Deputy Bureau Chief at the time, during the 1998 trial of Vladimir Campos, *People v. Campos*, 281 A.D.2d 638, 638 (2d Dep't 2001), a potential death penalty case. During direct examination at trial, a key witness blurted out that detectives coerced him into making a statement incriminating Campos, and that prior to trial he recanted his statement when meeting with Hale, and later failed a lie detector test. The defense objected that Hale had failed to disclose any of this information and moved for a mistrial.

---

[25]The City ultimately agreed to pay Quezada $9,000,0000 to settle his civil case in 2013, asserting, among other things, a *Monell* claim based on Hynes's policies.

202.     Hale responded by arguing, in accordance with the Hynes's Trial Policies, that the witness' pretrial recantation was not *Brady* material because it was not credible.

203.     When the Court asked Hale whether he "had any knowledge of the purported lie detector test," Hale lied to the Court that he did not:

> "MR. HALE: No, Judge. I don't recall. I don't have anything in my file about that. The Court knows that I wasn't on this case right from the get-go. I'm not seeing anything in my files that purports to do that."

204.     But during a hearing on the *Brady* issue two days later, the DA's Office revealed that, in truth, Hale himself requested the lie detector test and he personally prepared the questions. It was also revealed that Hale had affirmatively misstated to the defense that the witness never recanted his story.

205.     The trial court, the Honorable Carolyn Demarest, found that the pretrial recantation and polygraph test constituted *Brady* material, that Hale was "absolutely without justification" in failing to disclose it, and that Hale's false representations to the court were "prosecutorial misconduct." *Id.* 499. As a sanction, Judge Demarest struck the testimony of the witness in its entirety and gave the jury a curative instruction.

206.     Despite this explicit judicial finding of Hale's misconduct, he was not investigated, sanctioned, disciplined or even penalized. Hale maintained his supervisory position in the DA's Office and continued to receive promotions, including a promotion to Chief Counsel to Hynes— along with a pay raise. Nor was the court's finding of misconduct placed in Hale's personnel file, preventing any successor DA from learning of Hale's misconduct.

207.     But perhaps the most egregious and revealing example of the Hynes Trial Policies and Hynes's indifference to such conduct is the case of Jabbar Collins. (Civil complaint in *Collins*

*v. City of New York, et.al.*, 11 CV 766 (FB) (RML) (E.D.N.Y.)(Doc. No. 1), which we incorporate here and in all following paragraphs.)

208.    Collins was arrested in 1994 and prosecuted in 1995.

209.    In 2006, Collins brought a post-conviction motion documenting, among other misconduct, *Brady* violations, witness coercion and the knowing presentation of false evidence and argument by prosecutor Michael Vecchione, then chief of the KCDA's Homicide Bureau, later Hynes's Chief of Investigations, and Hynes's close confidante.

210.    Rather than investigate whether Collins's allegations were true, Hynes assigned several attorneys who were Vecchione's direct subordinates, and who second-seated him on several high-profile homicide cases, to defend Vecchione's conduct no matter how egregious.

211.    These prosecutors presented a false sworn affirmation in court by Vecchione denying the allegations, which caused Collins's 440 motion to be denied.  However, proceedings in Collins's subsequent federal *habeas corpus* action before the Honorable Dora L. Irizarry, *Collins v. Ercole*, 08 CV 1359 (DLI), forced the KCDA to disclose extensive *Brady* material the KCDA possessed all along but previously withheld from Collins.  The disclosure revealed that Vecchione's sworn affirmation, used to defeat Collins's state 440 motion, was perjurious.

212.    Yet Hynes continued to support Vecchione, declared he had done nothing wrong, and held him out as exemplifying the qualities that served as an example to other prosecutors in the office.  Ultimately, in granting Collins's *habeas* petition, dismissing the underlying state indictment, and releasing Collins from custody after 16 years of wrongful imprisonment, Judge Irizarry condemned Hynes and the KCDA for defending Vecchione's misconduct and for Hynes's failure to properly train, supervise and discipline his staff.

213.    In the face of those egregious constitutional violations, Hynes had his prosecutors declare on the record during the June 8, 2010, proceeding dismissing the case before Judge Irizarry —only a year before Maddix's case began— that:

> "This Office stands behind the conduct of former Assistant District Attorney Posnor and Frascogna and current Assistant District Attorney Vecchione, who prosecuted the defendant at his trial, along with the Office's staff and detective investigators who assisted them[.]"

214.    Within a day of the dismissal, Hynes told media representatives that Vecchione was a "very principled lawyer," "was not guilty of any misconduct," and that he would not conduct any investigation into Vecchione's conduct.

215.    Hynes summarily declared Vecchione would face no disciplinary action. Hynes thereafter promoted Vecchione and continued to praise him. Collins then brought a *Monell* action against the City based on Hynes's policies and ratification of Vecchione's misconduct. The Honorable Frederick Block excoriated Vecchione's misconduct and Hynes's failure to conduct any investigation.[26] Yet even after Judge Block's condemnation, which was reported in virtually all major New York newspapers, Hynes did not even read Collins's civil complaint, 440 papers, or habeas petition to review Vecchione's conduct. Deposition of Charles J. Hynes, *Collins v. City of New York*, 11 CV 766 (FB)(RML), December 19, 2013, p. 12. As a result of the KCDA's misconduct, the City ultimately paid Collins $10,000,000 in damages to settle his lawsuit in 2014.

216.    Even after Hynes was voted out and left office on December 31, 2013, the new and subsequent administrations *continued* Hynes's policies, including failing to discipline prosecutors

---

[26]Mitchel Maddux, *Lawsuit judge blasts Hynes*, New York Post, Nov. 17, 2012 ("'Hynes hasn't treated this seriously,' Block said, referring to allegations that Vecchione threatened two witnesses in the murder probe with violence and withheld exculpatory evidence.")

for suppressing *Brady* material, using false evidence and argument and withholding objectively favorable evidence simply because the prosecutor subjectively disbelieved the evidence.

217.    For example, in May 2022, the KCDA's Office fired a prosecutor who blew the whistle about another prosecutor suppressing *Brady* material and protected and later promoted the prosecutor who suppressed the *Brady* material.  Specifically, in May 2021, ADA Kamephis Perez was assigned to work on an appeal filed by a man named Rashan Hay.  *People v. Hay*, Kings Co. Ind. No. 9123/2014.

218.    In August 2016, Hay was convicted of burglary in the second degree as a sexually motivated felony, attempted rape in the first degree, and related charges.

219.    ADA Alanna Tierney prosecuted Hay's case.

220.    The principal evidence against Hay was the testimony of the complainant.

221.    The complainant alleged that Hay unexpectedly showed up at her apartment, pushed his way in, and sexually assaulted her.

222.    The complainant testified at trial that she and Hay used to be involved in a romantic relationship, but that their relationship ended a year prior to the alleged incident.

223.    The complainant also testified that she did not communicate with Hay in months prior to the day of the incident.

224.    Hay testified in his defense and denied the complainant's allegations.

225.    According to Hay's testimony, he and the complainant were dating at the time of the alleged incident, and he denied assaulting her.

226.    Contrary to the complainant's testimony, Hay also testified that he and the complainant remained in a relationship and in close and regular contact leading up to the day of the alleged assault, including frequent phone calls and text messages.

227. The jury convicted Hay.

228. Hay was sentenced to ten years in prison.

229. While working on the People's opposition to Hay's appeal, ADA Perez examined the trial file in detail.

230. In doing so, ADA Perez discovered phone records, including a document logging the calls made by, and received from, the complainant's phone (the "Complainant's Call Log").

231. The Complainant's Call Log called into serious doubt the truth of a number of key aspects of the complainant's testimony at trial.

232. The Complainant's Call Log showed that, consistent with Hay's testimony, the complainant and Hay were in fact in regular contact by phone leading up to the day of the incident, contrary to her testimony that they had not spoken in several months.

233. ADA Perez believed that the Complainant's Call Log was favorable evidence for Hay because, if it were disclosed to the defense, then it would have been used to impeach the testimony of the complainant at trial.

234. ADA Perez reported his findings to his supervisor, ADA Jodi Mandel, who instructed him to contact the trial prosecutor, Tierney.

235. Perez called Tierney and during that call, Tierney referred to Hay as a "scumbag" and a "piece of shit." Unaware of the nature of the call, she revealed to Perez that:

      (a)    The complainant was initially cooperative but then stopped responding to Tierney shortly after the criminal complaint was signed;

      (b)    Tierney and an investigator had posed as a married couple to get into a maternity ward to try and convince the complainant to testify;

      (c)    Tierney believed the complainant had been having an affair with Yannick Phillips, another witness who, like the complainant, swore under oath that they were *not* having an affair;

(d)     Tierney anticipated Phillips would be uncooperative and prepared a Material Witness Order in advance of a meeting with Phillips at the KCDA's Office;

(e)     Phillips showed up to her office for the meeting with counsel and then pled the Fifth when Tierney questioned him about the case;

(f)     Tierney threatened Phillips that if he did not cooperate with her, she would serve him with a material witness order while he was sitting down to have dinner with his family, thus outing his affair with the complainant to his wife;

(g)     Another witness, Modesta Ortiz, who claimed at trial to have heard yelling from the complainant's apartment, suffered from "auditory hallucinations;" and

(h)     When Tierney knocked on Ortiz' door, Ortiz told her that she had met Tierney in a dream last week before the incident occurred, so she was expecting her.

236.     None of the above information was disclosed to Hay or his defense attorney.  ADA Perez then contacted executives in the KCDA's Office and informed them of Tierney's suppression of *Brady* material, and his belief that Hay was wrongfully convicted.

237.     On or about June 16, 2021, KCDA Chief Assistant Nancy Hoppock convened a Teams video meeting about the issues Perez reported.

238.     Present at that Teams video meeting were: (a) Perez's supervisor Jodi Mandel; (b) Perez; (c) Tierney; (d) Hoppock; (e) Kevin O'Donnell; (f) Appeals Deputy Bureau Chief Bruffee; and (g) Miss Gregory, the Bureau Chief of the KCDA's Special Victims Unit.

239.     Upon information and belief, Ms. Hoppock took detailed notes of the meeting and/or it was recorded.  This collection of individuals was outside the typical chain of command for resolving issues concerning the usual duties of an Appeals Bureau lawyer.

240.     Hoppock agreed during that meeting that Tierney's failure to produce the Complainant's Call Log was a *Brady* violation.

241. During the Teams meeting, the KCDA attorneys discussed how to go about producing the Complainant's Call Log to Hay's appellate attorney (Hay's appeal was pending at the time).

242. Tierney criticized the decision to even convene the meeting at all and called out Perez in particular. In a rage, Tierney abruptly logged off the Teams meeting.

243. On or about July 28, 2021, ADA Perez was called into a meeting with Hoppock. Hoppock informed ADA Perez that the KCDA's Office decided to disclose the Complainant's Call Log to Hay's appellate attorney (with significant redactions). However, Happock said the KCDA's Office decided the remainder of the evidence Perez uncovered, in their view, it did not have to be disclosed because it was insufficiently corroborated, which is inconsistent with case law.[27]

244. The KCDA Office's decision to withhold this favorable evidence simply because it was not in the DA's view sufficiently corroborated directly implemented Hynes's policy of withholding favorable evidence if the prosecutor subjectively disbelieved it, which is unconstitutional.

245. Further implementing Hynes's policies, the KCDA's Office did not discipline Tierney for suppressing *Brady* material, suborning the complainant's false testimony and refusing to cooperate at the Teams meeting. Instead, Tierney was *promoted* to Deputy Bureau Chief.

246. In contrast, shortly after the Teams meeting, the KCDA's Office suspended ADA Perez and then *fired* him for blowing the whistle on Tierney's *Brady* violations.

---

[27]New York law long ago declared this was illegal. *People v. Baxley*, 84 N.Y.2d 208, 213–14 (1994) ("[N]ondisclosure cannot be excused merely because the trial prosecutor genuinely disbelieved [witness'] recantation.") (citation omitted); *People v. Robinson*, 133 A.D.2d 859, 860 (2d Dep't 1987) ("Even if the prosecution had valid reasons to consider this witness to be unreliable, it should nonetheless have provided the defense with [the witness' statement] which was clearly *Brady* material[.]")

247. While the KCDA's Office claimed ADA Perez was fired because of alleged discrepancies between his timecards, that explanation was a non-veiled pretext.

248. Tellingly, the prosecutor that handled ADA Perez's firing, Confidential Executive Assistant Maritza Mejia-Ming, had significant discrepancies in her own timecards, yet she faced no disciplinary action, much less termination. *See e.g.* Hella Winston and Susan Edelman, *Brooklyn DA promotes aide who trashed Jewish colleagues, uses office for personal benefit,* New York Post, July 29, 2023 (DA spokesman stating "[a]ny deficiencies [in Ming's time cards] will be remedied promptly.") (https://nypost.com/2023/07/29/brooklyn-da-promotes-aide-who-terrorizes-staff-flouts-rules).[28]

249. The Hynes Trial Policies detailed above individually and collectively, caused, permitted, encouraged, or acquiesced in the commission of constitutional violations of the rights of suspects and defendants by prosecutors, detective investigators and New York City Police Department detectives and officers working with Reeves, and substantially caused his misconduct at Maddix's trial and the violation of Maddix's constitutional rights.

250. The foregoing violations of Maddix's federal constitutional rights and resultant injuries were directly, foreseeably, proximately and substantially caused by conduct chargeable to the City, amounting to affirmative policies, practices, and customs and deliberate indifference to the constitutional rights of persons subject to prosecution by the KCDA, namely, those identified above, and:

    (a)    the institution and implementation of plainly inadequate or unlawful policies, procedures, regulations, practices and/or customs concerning:

        i.    the duty not to use false, misleading, or unreliable evidence, testimony, statements, or argument during criminal proceedings, including bail hearings, pretrial hearings and trial;

---

[28]On August 18, 2023, Perez sued the City, current Kings County DA Eric Gonzalez, and Ming for wrongful termination. *Perez v. City of New York, et. al.,* 23 CV 6253 (LDH)(RML). The litigation is ongoing.

ii. the continuing obligation to correct false, inaccurate, incomplete, or misleading evidence, testimony, statements and argument whenever such misconduct is discovered to have occurred, including moving or consenting to overturn convictions discovered to have been obtained through such unconstitutional means;

iii. the continuing duty to obtain, preserve and make timely disclosure to the appropriate parties, including the court and the defense, during criminal investigations and prosecutions, of all material evidence or information favorable to a person suspected, accused, or convicted of criminal conduct, including exculpatory evidence as well as evidence impeaching the credibility or undercutting the reliability of prosecution witnesses and including verbal as well as recorded information;

iv. the duty to refrain from abusing court process or otherwise coercing or manufacturing false or inherently unreliable statements and testimony from witnesses; and

(b) the failure to adequately investigate, instruct, supervise and discipline their employees with respect to such matters, or to rectify such practices.

251. The aforesaid affirmative or *de facto* policies, procedures, regulations, practices and/or customs were implemented or tolerated by policymaking officials for the City, including, but not limited to, Hynes and his delegates, who knew:

(a) to a moral certainty that such policies, procedures, regulations, practices, and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

(b) that such issues either present employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, supervision and/or discipline was demonstrated by a history of employees mishandling such situations as well as the incentives that employees have to make the wrong choice; and

(c) that the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause him constitutional injury.

252. The aforementioned policymaking officials had the knowledge alleged in the preceding paragraph, based upon, among other circumstances:

(a)      as noted above, numerous credible allegations, many substantiated by judicial decisions, **Exhibit O,** that ADAs had wrongfully withheld, lost, or destroyed evidence favorable to the defense that the prosecution had been required to timely disclose to the defense under *Brady,* had presented or failed to correct false or misleading testimony and argument and/or had used improper summation arguments;

(b)      civil lawsuits, some of which resulted in substantial civil settlements, alleging that police and/or ADAs had falsified, exaggerated, or withheld evidence, thereby wrongfully injuring individuals suspected or accused of crimes;

(c)      numerous decisions of the U.S. Supreme Court, the U.S. Court of Appeals for the Second Circuit, the New York Court of Appeals and the New York Appellate Divisions, recognizing the difficult issues that regularly arise under the *Brady* rule and the failures of New York City or Brooklyn prosecutors to comply with that rule; and

(d)      judicial decisions putting Hynes on notice that the City could be held liable for its failure to adequately investigate, supervise, or discipline ADAs regarding their *Brady* and related due process obligations, including their obligations not to use false testimony, *see e.g.*, *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992).

253.      Despite this knowledge, the supervisory and policymaking officers and officials of the City perpetuated or failed to take preventative or remedial measures to terminate said policies, procedures, regulations, practices and/or customs, did not effectively instruct, investigate or supervise their personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority, as described above, with deliberate indifference to the effect of said policies, procedures, regulations, practices and/or customs upon the constitutional rights of residents and citizens of the City and the State of New York.

254.      The aforesaid policies, procedures, regulations, practices and/or customs of the City were collectively and individually a substantial factor in bringing about the violations of Maddix's rights under the U.S. Constitution and Laws of the United States and in causing his damages.

255.     Under the principles of municipal liability for federal civil rights violations, the District Attorney of Kings County (or his authorized delegates) has final managerial responsibility for instructing, supervising, and disciplining attorneys and other employees in his office regarding their conduct in the prosecution of criminal matters, including, but not limited to, their obligations not to coerce witnesses or manufacture false or unreliable "evidence," not to abuse judicial process, to make timely disclosure of exculpatory evidence or *Brady* material to the defense, including post-trial, and to refrain from offering, and to correct, false or misleading evidence, testimony and argument during pretrial, trial and post-trial proceedings.

256.     Hynes, who was the highest-ranking New York City official with responsibility for setting and enforcing policy with respect to managing the personnel of his office, the KCDA and the functions of the office, had final policymaking authority in all such areas.

257.     Hynes, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision and discipline, with respect to his office's performance of its duties.

258.     Hynes at all relevant times was an elected officer of Kings County, one of the constituent counties of the City and the office was and is funded out of the City's budget.

259.     Furthermore, Hynes, as the District Attorney, was and is designated a "local officer," rather than a "state officer," under the New York Public Officers Law § 2 and federal *Monell* jurisprudence, *Bellamy v. City of New York*, 914 F.3d 727, 758-59 (2d Cir. 2019); and New York has provided by statute, under N.Y. County Law §§ 53, 94, that the City's constituent counties (including Kings County) and hence the City itself, shall have liability for torts committed by County officers and employees, such as the District Attorney and his assistants.

260. Hynes, personally and/or through his authorized delegates, at all relevant times, had final authority and constituted a City policymaker for whom the City is liable, with respect to the above-mentioned areas.

261. During all times material to this Complaint, the City, through its policymakers, owed a duty to the public at large and to Maddix, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs, and practices sufficient to prevent, deter and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

262. By virtue of the foregoing, the City is liable for having substantially caused the foregoing violations of Maddix's constitutional rights and his resultant injuries (¶ 117, above).

## FIFTH CAUSE OF ACTION
*Monell* Claim Based on the KCDA's Cover-Up Policy And
Custom; Defendant City

263. Plaintiff repeats the allegations above and incorporates them here.

264. Hynes, through his delegated policymakers, created and implemented a plainly unconstitutional, improper and deliberately indifferent policy, custom, or practice to cover-up and continue *Brady/Giglio* violations by KCDA trial prosecutors and to deprive victimized defendants of their constitutional right to post-conviction disclosure of *Brady/Giglio* material suppressed during their trials ("the cover-up policy") in violation of their rights under Due Process Clauses of the Fifth and Fourteenth Amendments.[29]

---

[29]*Steidl v. Fermon*, 494 F.3d 623, 630 (7th Cir. 2007) ("For evidence known to the state at the time of the trial, the duty to disclose extends throughout the legal proceedings that may affect either guilt or punishment, including post-conviction proceedings. Put differently, the taint on the trial that took place continues throughout the proceedings, and thus the duty to disclose and allow correction of that taint continues."); *Patterson v. Burge*, 328 F. Supp.2d 878, 899-901 (N.D. Ill. 2004) (same); ¶¶ 128-138, *supra*.

265.    The Hynes cover-up policy included,

(a)    Failing to disclose, and failing to create or implement any policy requiring attorneys in the KCDA Appeals Bureau to search for and provide to the defense, *Brady/Giglio* material suppressed by trial prosecutors during trial, disclosure of which would have undermined the probable cause for continuation of the prosecutions;

(b)    Responding to convicted defendants' FOIL requests for *Brady/Giglio* material by restricting the search for such material to the limited records held in the defendants' criminal case files, despite the fact that the KCDA holds such material outside of defendants' case files (*e.g.* in the Paralegal File, Detective-Investigator Squad, Witness Relocation Unit, Crime Victims Unit, *etc.*), a practice declared illegal but still followed by the KCDA, *See Collins v. Hynes*, Kings Co. Index No. 22973/96, Decision and Order, Jan. 22, 1997, pp. 7-8 (Sup. Ct. Kings Co.) (Dowd, J.) (KCDA's search "shall not be limited to respondent's case file in the underlying criminal case, but to any record" in the KCDA's possession. The FOIL "does not limit searches to case files but to records kept by the agency");

(c)    Summarily denying convicted defendants' FOIL requests for *Brady* and *Rosario* material when the defendants' trial files did not contain documents literally labeled "*Brady*" or "*Rosario*" material, notwithstanding that the records within the file were clearly such material based on their content, and such records were held outside of the defendants' trial files, another practice long ago declared illegal. *See Collins v. Hynes*, at pp. 8-9 (Dowd, J.) (rejecting KCDA's argument that a FOIL request for all *Rosario* material was insufficient under the FOIL and ruling the KCDA was obligated to disclose all records that contained information constituting *Rosario* material as defined by CPL § 240.45);

(d)    Creating memorandums for inclusion in convicted defendants' FOIL Files to ensure the KCDA's responses to the defendants' FOIL requests are consistent with the trial prosecutors' trial narratives and did not disclose or reveal any information that was not turned over at trial (*see e.g.* **Exhibit U**) (KCDA Memorandum to FOIL File discussing the non-disclosure of a letter the trial prosecutor wrote to the probation department concerning a witness which a defendant specifically requested in a FOIL request, but which the KCDA falsely denied access to on the ground that the letter did not exist); and

(e)    Defending wrongful convictions once they came to light and covering up other's misconduct.

266.     The Hynes policies functioned to cover-up *Brady/Giglio* material suppressed during Maddix's and other defendants' trials, appeals, and post-conviction challenges.

267.     For example, in April 1995, shortly after Maddix was convicted,[30] Jabbar Collins was convicted of murder and sentenced to 34 and 2/3 years to life in prison. In May 1995, Collins began making FOIL requests to the KCDA for *Brady* material concerning three key witnesses who then Homicide Bureau Chief Michael Vecchione presented at trial as Good Samaritans who testified against Collins with no undisclosed reason for doing so.

268.     From 1995 to 2008, Collins made a series of FOIL requests to the KCDA attempting to obtain documents proving the prosecutor's trial narrative regarding the witnesses was false and that the witnesses had undisclosed motives for testifying.

269.     Yet in accordance with the cover-up policy, the KCDA falsely denied each of those requests on the ground that the *Brady* material did not exist. When Collins brought state court lawsuits to challenge those denials, the KCDA defeated the lawsuits by falsely affirming to the court that the records Collins sought did not exist or were not in the KCDA's possession. Likewise, throughout Collins's state court appeals and post-conviction challenges, the KCDA falsely represented the prosecution's trial narrative was truthful and that the prosecutor did suppress any *Brady* material.

270.     However, in 2010, during court-ordered discovery in Collins's federal *habeas corpus* proceeding, *Collins v. Ercole*, 08 CV 1359 (DLI), the KCDA was forced to disclose the

---

[30]Post-incident evidence is relevant to a claim of municipal liability as it may "shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right." *Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989); *see also Henry v. County of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997) ("[W]e reiterate our rule that post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry."). Moreover, many of the events described above took place during the 19-year period when the KCDA was actively continuing their suppression of *Brady* material concealed during Maddix's trial.

very *Brady/Giglio* material the KCDA claimed for 15 years did not exist, including: (a) a *Damiani* order proving a key witness refused to be produced to the KCDA but was brought there anyway; (b) records showing the witness had been a suspect in a robbery and lied to police immediately before implicating Collins in the crime; (c) a material witness order, warrant and supporting affidavit pertaining to the second witness, showing he had been uncooperative with the KCDA and had to be incarcerated for weeks and forced to testify; (d) an out-of-state material witness warrant pertaining to the third witness, showing the witness had been uncooperative with the KCDA prior to trial; (e) a New York City Probation Department memorandum to KCDA detective-investigators disclosing plans to initiate violation of probation proceedings against that witness and (f) two letters Vecchione wrote to the New York City Department of Probation on behalf of that witness, resulting in the Probation Department forgoing violation of probation proceedings in light of the witness' cooperation.

271.     Most of these records were in the KCDA's "Paralegal's File," which the KCDA maintained separate and apart from the defendant's trial file.

272.     Shortly after revealing the above records, the KCDA consented to the dismissal of Collins's indictment and his immediate release from prison.

273.     The KCDA's withholding of this *Brady* material in response to Collins's FOIL requests in 1995, and later, caused him to needlessly spend 15 years in prison.

274.     In May 1995 Gregory Ellis was convicted of murder and sentenced to life in prison. The only witness implicating Ellis in the crime was a drug addict named Richard Rivera, who did not implicate Ellis in the crime until over three weeks after the homicide.

275. At trial and during summation, Reeves, who prosecuted Maddix, falsely represented that when Rivera initially implicated Ellis, Rivera had no reason to do so, did not have any open cases, and had no reason for testifying against Ellis at trial.

276. Over the course of the next 23 years, Ellis made numerous FOIL requests to the KCDA for all *Brady* material in his case, including evidence that contradicted the trial narrative that Rivera was a Good Samaritan.

277. The KCDA denied each of those requests on the false grounds that the *Brady* material did not exist or could not be located. Likewise, throughout Ellis's state court appeals and post-conviction challenges, the KCDA falsely represented Rivera was truthful, did not commit perjury, and that the prosecutor did not suppress any *Brady* material.

278. Yet in 2020, a new attorney for Ellis made a FOIL request for River's case file and discovered documents establishing, among other things: (a) when police initially brought Rivera to the KCDA for questioning about the murder, he had an open warrant for his arrest in an undisclosed criminal possession of a controlled substance case, faced a year in jail and faced a possible parole violation that could have put him back in state prison for over a year; (b) after Rivera cooperated at the KCDA, prosecutors allowed him to remain at liberty without arresting or returning him on the warrant; (c) the KCDA gave Rivera thousands of dollars for a new apartment, (d) when Rivera was arrested for a new grand larceny case a year later, Rivera called Reeves asking that Reeves have the case dismissed and Reeves personally secured Rivera, a predicate felony offender who was still on parole, a favorable bail; and (e) after Reeves's intervention, the KCDA offered Rivera a favorable plea bargain.

279.    These records were in River's case file, which the KCDA wrongfully withheld.

280.    The KCDA's withholding of this *Brady* material in response to FOIL requests in 1996 and later, caused Ellis to spend 24 years in prison.

281.    In November 1998, Tasker Spruill was convicted of murder. During his trial, KCDA prosecutor Shawn Newton presented the star witness against him—who was incarcerated in state prison—as a Good Samaritan who freely cooperated with the KCDA and testified voluntarily with no undisclosed incentive for doing so.

282.    Following his conviction, Spruill filed a series of FOIL requests with the KCDA attempting to secure *Brady* material proving the prosecutor's trial narrative regarding the witness was false and that the witness had been coerced into testifying.

283.    For the next 10 years, however, the KCDA falsely denied Spruill's FOIL requests on the grounds that no such material existed. When Spruill commenced a state lawsuit to challenge the denial, the KCDA defeated it by falsely affirming to the court that it made a full disclosure of all available material. *Spruill v. Hynes*, Kings County Index Number 11036/10. Likewise, throughout Spruill's state court appeals, federal *habeas* challenges and CPL § 440.10 litigation, the KCDA falsely represented Newton never refused to meet with the prosecutor and testified voluntarily.

284.    Yet 10 years later, the KCDA, faced with a subpoena *duces tecum* during litigation of Spruill's CPL § 440 motion, disclosed: (a) 12 *Damiani* orders lacking the star witness' consent to be produced to the KCDA; (b) a *Damiani* order memorializing the witness' explicit

refusal to be transferred to the KCDA to meet the prosecutor; and (c) several orders to produce, issued upon false affirmations and used to produce Newton to the KCDA over 20 times.[31]

285.     The KCDA also revealed a secret material witness order demonstrating the KCDA had custody of another witness the prosecutor falsely represented might disappear if the court did not permit her to testify that day.

286.     These undisclosed *Damiani* orders, orders to produce and the material witness order were maintained in the KCDA Detective-Investigators Squad, separate and apart from the prosecutor's trial file.

287.     On March 27, 2017, the 440 court vacated Spruill's conviction on coercion, *Brady* and false testimony grounds, finding the records should have been disclosed to the defense.

288.     The KCDA's unconscionable cover-up policy in defending wrongful convictions once they came to light and prosecutors covering up each other's misconduct, is further demonstrated by the conduct of Hynes and eight members of his executive staff once the extent of Hynes's wrongful convictions became public.  As previously stated, each of those officials would admit to the New York City Conflict of Interest Board, that they each violated New York City Charter § 2604, conduct constituting a Class A misdemeanor (misusing City resources).  Hynes and his executives never reported each other's misconduct and violations of their oaths of office, but rather collectively took part in this outrageous conduct.  Even after Hynes's executives *admitted* to committing these acts, Hynes publicly declared they "did nothing wrong."

289.     The Hynes cover-up policy is also demonstrated by KCDA Executive DA Dino Amoroso's actions in pressuring an ADA to sign a false declaration to cover up evidence that

---

[31]The witness' correction records revealed that when correction officials executed one of those orders to produce, the witness attempted to kill himself in his prison cell, but was forced to be produced to the KCDA anyway.

prosecutors were trained to suppress *Brady* material. ADA Barbara Burke was assigned to compile KCDA records responsive to the Plaintiff's discovery demands in the Jabbar Collins lawsuit.

290.    One of those demands sought any recordings and attendance sheets of a KCDA training session conducted by Michael Vecchione and the Sex Crimes Bureau Chief during which ADAs were instructed that *Brady* material that was not memorialized —sex crimes victims' pretrial denials or recantations—did not have to be disclosed to the defense, which is unconstitutional.

291.    When ADA Burke raised concerns about the KCDA's failure to disclose those records, Amoroso, Hynes's close friend, demoted ADA Burke from her executive position to the KCDA's Early Case Assessment Bureau, a position typically reserved for young, inexperienced ADAs joining the office.

292.    In August 2013, shortly after that demotion, Amoroso instructed ADA Burke to execute a declaration in the Jabbar Collins case falsely representing she had no knowledge of the training session or the attendance sheet. Hynes fired Burke after securing her declaration.

293.     ADA Burke decided to speak out and reported to the Federal Bureau of investigations that Amoroso pressured her into signing the declaration. In April 2014, she also wrote to Magistrate Judge Richard M. Levy, who was handling discovery in the Collins case, explaining that "Amoroso instructed [her] to sign" the misleading declaration and revealed that the instructional DVD of the training session actually existed, as well as the attendance sheet generated in connection with the training session. ECF Doc. No. 176, in *Collins v. City of New York*, 11 CV

766 (FB)(RML).[32] The City later disclosed the supposedly non-existent attendance sheet to the Plaintiff.

294.     The KCDA's cover-up policy prolonged Maddix's unjust loss of liberty, continued his unjust incarceration and deprived him of his constitutional rights to continuing disclosure of *Brady* and *Giglio* material suppressed by the State during his criminal trial, in violation of the Due Process Clauses of the Fifth and Fourteenth Amendments.

295.     The cover-up policy damaged Maddix as set forth above, including in ¶ 117.

## SIXTH CAUSE OF ACTION
*Monell* Claim Based On Marriott's policy, custom and practice of facilitating *Brady/Giglio* violations, policymakers' actions and deliberate indifference; Defendant Marriott

296.     Plaintiff repeats the allegations above and incorporates them here.

297.     Marriott, wholly delegated final policymaking authority to several local managers of the Marriott LaGuardia Hotel.  The managers were autonomous and their decisions on the assistance provided and the hotel rooms they rented to the KCDA went unreviewed and were never overruled.

298.     Through those managers, Marriott created and implemented a plainly illegal, unconstitutional, improper and deliberately indifferent policy, custom, or practice to knowingly facilitate and aid and abet the KCDA's illegal imprisonment of witnesses as prisoners and to serve as one of Hynes's *de facto* black sites (the "Marriott policy").

---

[32] Frances Robles and Vivian Yee, *A New Dispute Emerges in Brooklyn Prosecutor's Office, New York Times*, Nov. 22, 2013, p. 21 (https://www.nytimes.com/2013/11/23/nyregion/a-new-dispute-emerges-in-brooklyn-prosecutors-office.html)

299.    Marriott knew it was contracting with the KCDA, which prosecuted crimes in Brooklyn, New York, that the KCDA was confining witnesses in the LaGuardia Marriott, and thus that the witnesses in the hotel were likely connected to the KCDA's criminal cases.

300.    The managers, Marriott's policymaking officials, not only created, ratified, and participated in the Marriott policy, but participated in creating and approving the administrative paperwork to facilitate it.

301.    Marriott formalized its role as Hynes's black site by adopting the same "Custody Number" organizing system used by the KCDA.

302.    Each witness held in the Marriott was assigned a "custody number," and Marriott used those "custody numbers" to track the witnesses' hotel room and referenced the "custody number" in billings to the KCDA for Marriott services.

303.    Marriott also followed the KCDA instructions, memorialized in KCDA cover letters to Marriott confirming the rooms for the witnesses, on how the hotel rooms should be arranged, the dates of detentions, when to extend or close the "custodies," and that Marriott should ensure the witnesses had no communication with the outside world.

304.    Marriott managers had both actual and constructive notice of the nature of the witnesses' involuntary detentions by virtue of:

(a)    Marriott's communications with the KCDA Witness Relocation Unit Supervisor;

(b)    The KCDA's instructions to Marriott concerning the witnesses' rooms;

(c)    Observing KCDA detective-investigators transporting prisoners in and out of the hotel in handcuffs and, at times, leg shackles;

(d)    Damage to the hotel room doors caused by the shackles detective-investigators would place on the doors to prevent the witnesses from escaping; and

(e) New York City Police Department responding to the hotel because of volatile prisoner behavior.

305. Nevertheless, the managers turned a blind eye to the KCDA's conduct, acted in concert with the KCDA to confine the witnesses and allowed the Marriott policy to continue.

306. Marriott also took affirmative steps to ensure that the witnesses, in accordance with the KCDA's wishes, had no way to complain or alert anyone of their confinement and that the KCDA's conduct would remain secret.

307. Marriott precluded the witnesses from contacting anyone for help by cutting off the hotel room telephone provided to every other hotel guest.

308. While Marriott established means for other guests and employees to complain about their stay or even contact police, Marriott instructed its staff not to communicate with the witnesses, that the witnesses' presence was confidential, thereby ensuring the witnesses' isolation.

309. Marriott also gave hotel staff special instructions on how to deal with witnesses, including when delivering room service to the KCDA detective-investigators overseeing the witnesses' detention.

310. Marriott also failed to report to any law enforcement agency the obvious unlawful confinement of witnesses despite the lack of any New York law authorizing such confinements. In contrast, Marriott reported to the KCDA all unusual incidents involving the witnesses.

311. Marriott managers, rather than reward hotel employees for voicing concerns about the use of hotel rooms in this manner, instructed employees to keep the practice confidential and rewarded those who did with recognition, good performance evaluations, promotions and raises.

312. Marriott also received substantial financial benefits and a dependable stream of revenue because of the Marriott policy.

313. Based on the substantial income brought in by the Marriott policy, Marriott gave the KCDA "government rates,"—approved by Marriott policymaking individuals— encouraging the KCDA to use Marriott to incarcerate even more recalcitrant witnesses.

314. Marriott and its policymakers, by implementing the Marriott policy, jointly engaged with the KCDA in the conduct detailed above, and it was reasonably foreseeable that the secrecy Marriott and the KCDA employed to conceal the witnesses' unlawful confinement would continue throughout the cases for which the KCDA imprisoned the witnesses, including Maddix's case.

315. The Marriott policy proximately caused the non-disclosure of the *Brady/Giglio* material at Maddix's trial.

316. By virtue of the foregoing, Marriott is liable for having substantially caused the foregoing violations of Maddix's constitutional rights and his resultant injuries (¶ 117, above).

<u>**SEVENTH CAUSE OF ACTION**</u>
42 U.S.C. §1983 Civil Conspiracy, Concerted Action And Aiding and Abetting The Violation Of Maddix's Fifth And Fourteenth Amendment Rights To A Fair Trial, Post-Conviction Disclosure Of *Brady/Giglio* Material; All Defendants

317. Plaintiff repeats the allegations above and incorporates them here.

318. The City, through KCDA Hynes and his delegated policymakers, policies, customs and practices, Marriott, through its delegated policymakers, policies, customs and practices and Reeves, explicitly and/or implicitly corruptly agreed to commit with each other, and/or other unnamed conspirators, the wrongs detailed above and to imprison DeJesus, and cover-up each other's misconduct.

319.     Reeves, the City and Marriott committed the overt acts, *as detailed above* (¶¶ 1 - 291) to accomplish the goal of the conspiracy, including, but not limited to illegally imprisoning DeJesus and covering up the *Brady/Giglio* material resulting from those actions.

320.     Reeves, the KCDA and Marriott conspired to perform the wrongful acts detailed above that caused Maddix's injuries.

321.     Marriott was aware of the roles its policymakers, employees and agents as part of those illegal or tortious acts at the time it aided the City and Reeves in committing those wrongful acts, and at the time it implemented and carried out the Marriott policy.

322.     Marriott knowingly and substantially assisted the principal violations committed by the City and Reeves.

323.     By virtue of the foregoing, the City, Marriott and Reeves conspired to deprive Maddix of his constitutional rights to timely disclosure of all material evidence favorable to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972) and their progeny, and the Due Process and Fair Trial Clauses of the Fifth and Fourteenth Amendments to the United States Constitution.

324.     The KCDA and Marriott committed the foregoing violations of Maddix's constitutional rights knowingly, intentionally, willfully, recklessly and/or with deliberate indifference to them, or to the effect of such misconduct upon them.

325.     By reason of the foregoing, the City and Marriott are liable to Maddix pursuant to 42 U.S.C. § 1983, the damages detailed in ¶ 117, above.

## EIGHTH CAUSE OF ACTION

New York State Constitutional Due Process Claim Pursuant To *Respondeat Superior*; *Buari v. City of New York*, 530 F.Supp.3d 356 (S.D.N.Y. 2021); *Bolt v. City of New York*, 21 CV 2218 (Report & Recommendation, Sept 15, 2023) (Kuo, M.J.); *Johnson v. City of New York*, 21 CV 2220 (Sept. 15, 2023) (Kuo, M.J.) (Report & Recommendation, Sept. 15, 2023; Defendant Marriott

326.    Plaintiff repeats the allegations above and incorporates them here.

327.    Marriott, by virtue of their acts and omissions detailed above, violated Maddix's rights under the Due Process and Equal Protection provisions of the New York State Constitution (a) to due process of law, (b) to a fair trial, and (c) *Brady/Giglio* material.

328.    As a direct and proximate result of these defendants' acts and omissions, Maddix was wrongfully convicted and imprisoned for 19 years, and suffered other grievous and continuing injuries set forth in ¶ 117, above.

329.    Marriott is liable under *respondeat superior* for the acts and omissions of its employees and agents, which were within the scope of their employment, for Maddix's damages.

## DAMAGES DEMAND

WHEREFORE, Maddix demands judgment against defendants as follows:

(a)    Compensatory damages of not less than $40,000,000 from the City and Marriott;

(b)    Punitive damages from Marriott in the amount of $60,000,000;

(c)    A declaratory judgment that Reeves's acts and omissions detailed above violated Maddix's First Amendment right of access to the courts and his due process under the Fourteenth Amendment to the U.S. Constitution;

(d)    For reasonable attorneys' fees, together with costs;

(e)    For pre-judgment interest as allowed by law; and

(f)    For such further relief as this Court may deem just and proper, including estopping defendants under the equitable estoppel, unclean hands and fraudulent concealment doctrines, from raising the statute of limitations and *Heck* defenses.

Dated:  April 22, 2025
      New York, New York

Andrew M. Stengel, Esq.
The Law Firm of Andrew M. Stengel, P.C.
*Attorneys for Willie Maddix*
11 Broadway Suite 715
New York, New York 10004
Tel: 212-634-9222
Fax: 212-634-9223
Email: andrew@stengellaw.com